**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **No. 1:20-cr-167 (TSE)** |
| **v.** | ) | |
| | ) | **Sentencing: March 26, 2021** |
| **DANIEL BOICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

There has never been a dispute about the substance of this case. Within a few months of indictment Mr. Boice pleaded guilty, agreed to pay full restitution, and assisted in providing all his tangible assets for liquidation. He did so aware that he would become a convicted felon facing a multi-year prison sentence with financial debts that will follow him for the rest of his life. As the numerous letters of support attached to this Memorandum demonstrate, the present unforgivable lapse in character, integrity and judgment is out of character for Mr. Boice. He has always been a loving and devoted father and, before his involvement in Trustify, worked hard to succeed in his career and to be an upstanding and law-abiding citizen.

Regarding the advisory Sentencing Guidelines, Mr. Boice disputes application of the sophisticated means enhancement, but otherwise agrees with the range calculated in the Presentencing Report ("PSR"). He submits that the appropriately-calculated advisory sentencing range is 78-97 months (based on a final offense level of 28 and Criminal History Category I). Regardless of how the Court rules on that

issue, however, Mr. Boice respectfully submits that a sentence of 60 months, which is somewhat below the advisory sentencing range, is warranted. A 60-month sentence would reflect Mr. Boice's early and unequivocal acceptance of responsibility, his clean criminal record, and the recognition by courts and commentators across the country that the advisory sentencing range in high-loss financial cases generally overstates the need for sentencing. Moreover, a 60-month sentence would be consistent with the sentences imposed on similarly-situated offenders sentenced in recent years in this court—many of which received far larger variances as a percentage of the Guideline range than is requested here.

I.  **The PSR Incorrectly Assesses a Two-Level Enhancement for Sophisticated Means**

The PSR asserts that the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." PSR ¶ 77.[1] Mr. Boice respectfully disagrees. The conduct here involved garden-variety deceptive practices, bares none of the hallmarks of sophisticated fraud, and does not warrant enhancement under U.S.S.G. § 2B1.1.

"Sophisticated means" are defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of [the] offense."

---

[1] In 2015, the Guidelines were amended to "narrow[] the focus" to "cases in which the defendant intentionally engaged in or caused conduct constituting sophisticated means" from the broader approach of applying "sophisticated means" if "the offense otherwise involved sophisticated means." Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 976 (2017).

U.S.S.G. § 2B1.1 App. Note 9(B). Sophistication "require[s] more than just thoughtful or potentially successful planning," *United States v. Adepoju*, 756 F.3d 250, 259 (4th Cir. 2014); there must be "'some means of execution that separates the offense before us from the ordinary or generic.'" *Id.* at 258 (quoting *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012)).

The Fourth Circuit has explained that "sophisticated means" "requires more than the concealment or complexities inherent in fraud," and "[t]hus fraud per se is inadequate for demonstrating the complexity required for enhancement under U.S.S.G. § 2B1.1(b)(10)(C)." *Id.* at 257. In *Adepoju*, the court held that using forged documents and a stolen identity—"the presence of the tools to commit fraud and the plan to use those tools"—could not constitute "sophisticated means," because "the realm of especial complexities and intricacies involves more than the forgeries, misrepresentation, and concealment inherent in" fraud. *Id.* at 257, 258. In so holding, the court distinguished an earlier case involving "a 'painstaking attempt' to create documents that would survive scrutiny of a bank issuing more than $600,000 in loans for luxury cars," explaining that, "[i]n contrast, the documents and forgeries now before us did not require such meticulous fabrications." *Id.* at 258 n. 4; *see also United States v. Archuletta*, 231 F.3d 682, 685–86 (10th Cir. 2000) (defendant's conduct amounted to "nothing more than the minimum conduct required to establish a [bank fraud] violation . . . in its simplest form").

The "essence" of "sophisticated means" is "deliberate steps taken to make the offense difficult to detect." *United States v. Fitzgerald*, 416 Fed. Appx. 238, 245 (4th

Cir. 2011) (quoting *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001)).  This observation follows the examples in the Guidelines—all of which are acts designed to conceal the offense: "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction… [or] hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  U.S.S.G. § 2B1.1, App. Note 9(B).

Indeed, courts have increasingly refused to apply the sophisticated means enhancement absent efforts by the defendant to conceal the fraudulent conduct.  For example, the Fifth Circuit found clear error in applying the sophisticated means enhancement where the defendant "used no false names, fictitious entities, shell companies or complicated financial transactions, or any other particularly sophisticated means to *hide or conceal the assets*."  *United States v. Valdez*, 726 F.3d 684, 695 (5th Cir.2013) (emphasis added); *see also United States v. Mendez*, 420 Fed. Appx. 933, 938 (11th Cir.2011) ("In *each case*… the defendant used false identities, fraudulent accounts, or fictitious entities to *conceal* his participation in the scheme or to *execute and conceal* the fraudulent transactions.") (emphasis added).  Similarly, the Fourth Circuit, has noted that "[c]ourts have found that sophisticated means were used when individuals used other people to hide assets and structured cash deals to avoid reporting."  *Fitzgerald*, 416 Fed. Appx. at 245 (internal citations omitted); *see also United States v. Bailey*, 216 Fed. Appx. 378 (4th Cir. 2007) (sustaining enhancement where defendant used third-party accounts to mask his income and refused direct payments in personal accounts to avoid IRS); *United States v. Bond*,

181 Fed. Appx. 357 (4th Cir. 2006) (sustaining enhancement for use of financial trusts and corporations to mask illicit transactions).

Finally, corporate fraud inherently involves some level of complexity, so the size and scope of an offense of this sort does not, in itself, justify enhancement. *United States v. Hulse*, 989 F. Supp. 2d 1224, 1227 (M.D. Ala. 2013).  For example, in an insider trading case, the Fifth Circuit explained, "[t]he court recognizes that the scheme here involved large sums of money and the use of complex financial instruments, but neither of these circumstances nor any of the circumstances cited by probation or the government, alone or collectively, establishes that the scheme itself was 'especially' complex or intricate." *Hulse*, 989 F. Supp. 2d at 1227.  Likewise, the Eighth Circuit reversed an application of the sophisticated means enhancement despite finding that the "fraudulent conduct was certainly extensive, both as to the length of time during which it was conducted, and the amount of illegitimate funds garnered." *United States v. Kline*, 61 F. App'x 987, 991 (8th Cir. 2003).

Mr. Boice's offense conduct bares none of the hallmarks of sophisticated fraud: there were no complex accounting schemes, no fictitious entities, nor any other "especially intricate" concealment of assets and transactions.  U.S.S.G. § 2B1.1, App. Note 9.  To the contrary, Mr. Boice listed himself as the president and chief executive officer using his true name, and the monies obtained through his scheme were transferred to his personal bank accounts and credit card.  PSR ¶ 29.  Mr. Boice "did not create fictitious entities, corporate shells, or offshore financial accounts… but rather opened readily identifiable accounts at local banks." *United States v. Brown*,

877 F. Supp. 2d 736, 752 (D. Minn. 2012) (finding sophisticated means enhancement did not apply to wire fraud conviction). Indeed, Mr. Boice did not conceal his ill-gotten gains whatsoever; the PSR notes that "Trustify's payment of BOICE's personal expenses incurred on BOICE's credit card, among other forms of compensation." PSR ¶ 45(b).[2]  *See Valdez*, 726 F.3d at 695 (finding clear error in imposing enhancement where defendant "took money directly deposited from Medicare into his operating account, which was in his name, and moved it into his investment accounts, which were also in his name.").

Nor was there anything especially complex about the conduct itself. U.S.S.G. § 2B1.1, App. Note 9. For instance, while "financial records" and "quarterly statements" may sound complex in the abstract, falsifying these documents here required nothing more than entering inflated numbers into existing charts or spreadsheets. *See United States v. Parris*, 573 F. Supp. 2d 744, 749 (E.D.N.Y. 2008) (noting there is "nothing particularly complex about issuing false press releases"). Similarly, the fraudulent email noted in the PSR (PSR ¶ 34) required nothing more than purchasing an account on GoDaddy.com and sending an email – something that any lay person with no particularized knowledge or skill can do in a matter of minutes

---

[2] GoLean LLC (PSR ¶ 29) is neither a fictitious entity nor a shell company; it was a personal holding company that existed prior to the offense conduct—i.e., "a legitimate holding company, used in an illegitimate manner." *Kline*, 61 F. App'x at 990 ("[Defendant's] plea agreement merely describes PMI as 'an investment company solely owned and controlled by defendant.' A solely-owned investment company is not necessarily a corporate shell. The PSR likewise refers to PMI as a 'personal holding company' owned solely by [Defendant]. A solely-owned personal holding company does not equate to a corporate shell either.")

for $2.99 (according to GoDaddy.com's website as of March 19, 2021). Mr. Boice's actions are far from a "painstaking attempt" to create intricate forgeries and cannot support application of the enhancement. *Adepoju*, 756 F.3d at 258, n. 4.

Moreover, nothing distinguishes the scheme as a whole from "ordinary or generic" corporate fraud. Nothing about the conduct was any more intricate or complex than it needed to be to make false statements to institutional investors to commit the fraud. Mr. Boice mispresented the size and growth of Trustify's financial performance and lied about the success of the company to various investors. PSR ¶¶ 23–26. This involved false statements to investors about the number of "private investigators who worked with Trustify and the number of Trustify employees," overstating Trustify's revenues, and misrepresenting how much Mr. Boice was paid by Trustify. PSR ¶¶ 23–29. "At its core, this scheme was essentially a series of unabashed lies…. the crux of this case is that [Mr. Boice] lied to obtain money and then lied about the use of the money"— which does not constitute "sophisticated means" as contemplated by § 2B1.1. *Hulse*, 989 F. Supp. 2d at 1227.

Finally, any conduct that arguably supports the sophisticated means enhancement is already accounted for by the large loss enhancement under U.S.S.G. § 2B1.1(b)(1)(K). PSR ¶ 60; *see Hulse*, 989 F. Supp. 2d at 1227 (enhancement not warranted "[s]ince the defendants' offense level already amply reflects their culpability based on the loss amount… an additional sophisticated-means enhancement"). As discussed further below, Mr. Boice has already agreed to be subjected to a twenty-level enhancement for loss regardless of whether the

sophisticated means enhancement applies.  Offenses of this magnitude almost by definition require the sorts of conduct involved here, so further enhancements should not be added for sophistication absent something additional.  *See United States v. Jackson*, 346 F. 3d 22, 26 (2d Cir. 2003) (remanding for consideration of downward departure and explaining "even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.")  *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648–49 (2007) (factors such as sophisticated means "double-count because they are captured by other enhancements or by the loss calculation.").

II. **A Variant Sentence of 60 Months, Together With the Collateral Consequences Mr. Boice Will Face for the Remainder of his Life, Is Sufficient to Accomplish the Purposes of Sentencing**

Title 18 U.S.C. § 3553(a) requires the Court to impose the minimal sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.  Although the Sentencing Guidelines are to be considered, they are no substitute for this Court's independent determination of an appropriate sentence, including consideration of the § 3553 factors.  *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable…. The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable");

*see also Spears v. United States*, 555 U.S. 261, 263–64 (2009). As *Nelson* and *Spears* emphasize, the Guidelines are merely advisory, and courts should impose the least severe sentence necessary to accomplish the objectives set forth in § 3553.

The objectives of sentencing under § 3553 are to: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires the sentencing court to consider these factors in imposing sentence (besides the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; and (3) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct. 18 U.S.C. § 3553(a)(1-7).

A.   **Mr. Boice's Personal History and Characteristics Demonstrate the Aberrant Nature of the Offense**

Mr. Boice is a 41 year-old father of three and native of the Washington metropolitan area. Up until the time of the offense conduct, Mr. Boice was a law-abiding citizen, a productive member of society, and a loving father. As the letters attached here as Exhibit 1 demonstrate, the conduct for which Mr. Boice is now before the court represents a dramatic departure from the man he has always been. Having known him many years, having seen his kindness as a parent, son, and friend, and

observing first-hand the forthright manner in which Mr. Boice owned up to his crime, those who have known him the longest have unanimously attest that the offense represents a tragic lapse in judgment, not a reflection of Mr. Boice's true character.

Mr. Boice has always been a hard worker with an aptitude for overcoming adversity. As Jean Scheff, a family friend of 30 years explains, "Danny was a rising star from a young age. His ability and maturity exceeded those of most of his peers." Ex. 1 at 7. Recently, she explains, Mr. Boice has relocated and rented an apartment near her family in Florida, where she and Mr. Boice have had "long talks about life," and Mr. Boice has "take[n] ownership of his choices" and shown "profound regret for the decisions he made." *Id.* As his father explains, when Mr. Boice was thirteen, he was diagnosed with idiopathic thrombocytopenic purpura, a rare autoimmune disorder that required frequent hospitalizations, the removal of his spleen, and side lined his high-school athletic career. Ex. 1 at 5. Nonetheless, he reinvented himself as a computer programmer—something that, to that point, seemed unimaginable for a son who had always identified principally as an athlete—and completed high school, attended college, and built a successful career as a software engineer. *Id.*

In 2005, Mr. Boice married his first wife Joanne, and they later had two children together. As she describes it, throughout most of their marriage, Mr. Boice exhibited all the positive traits that each of the other letter-writers describes:

> He worked extremely hard to achieve success, build his professional resume and most importantly, to provide for his family. We had a good home, put the children in excellent schools and were both very actively involved and engaged in our community.

Ex. 1 at 1.

Although the two later went through a difficult and sometimes acrimonious divorce around the time Trustify was founded, Joanne describes a tremendous change in Danny since then. As she puts it: "Anyone who knows us would tell you that I am the last person they would expect" to write a letter on Mr. Boice's behalf. Ex. 1 at 1. Nonetheless, she explains:

> Upon his release from jail in June of 2019 [following a brief incarceration related to non-payment of child support after the collapse of Trustify], I accepted his apology and commitment to "be better" with a giant dose of skepticism. But to his credit, he has. He has worked diligently to find and maintain gainful employment. He has made every effort to pay as much child support as he can and has proactively and sincerely communicated when he could not. He has demonstrated consistent remorse for his actions and how he treated me and the children in the process.

Ex. 1 at 1.

Consistent with Joanne's description, up until the time of the offense conduct, Mr. Boice enjoyed a crime-free life. And, importantly, Trustify did not begin as a fraudulent enterprise. In the years leading up its founding, Mr. Boice started, ran, and sold a successful start-up company. *Id.* While, as his ex-wife notes, this success may have planted the seed that led to his downfall, it is clear that he did not begin the venture with ill intentions. Indeed, Mr. Boice spent more than a year and several hundred thousand dollars developing the business prior to its founding, with a sincere belief in its potential and mission.

At some point along the way, in Joanne Boice's words, Mr. Boice "utterly lost his way," Ex. 1 at 2, and committed (in his mother's words) the "egregious errors" for

which he is now before the Court.  Ex. 1 at 3.  Mr. Boice makes no excuse for his choices – which he describes as "abysmal," *see* PSR ¶ 71 – but the turmoil he was experiencing in his personal life almost certainly contributed to the terrible judgment he displayed at the time of the offense.  Around that time, Mr. Boice was engaged in a bitter legal dispute with his ex-wife, lost custody of his children, and was estranged from each of his parents – although he has since reconciled and now has an excellent relationship with each of them.  *See* Ex. 1 at 3, 4.  These problems in his personal life were compound by his company's failure to live up to expectations.  Mr. Boice "became consumed with success" and he "was driven to an unhealthy level."  Ex 1 at 1.  As the pressures mounted, Mr. Boice made a series of inexcusable choices in an effort to maintain a lifestyle he had never had.  Mr. Boice's story does not excuse his actions, but it is not an uncommon one.  And the genuine contrition described in the attached letters, as well as the strong family and community support Mr. Boice enjoys, bodes well for Mr. Boice's successful return to society once he serves his sentence.

Indeed, Mr. Boice has accepted responsibility for these actions without equivocation.  In his own words: "There are no excuses regarding these offenses. I made several abysmal choices that led to these charges and my subsequent guilt." PSR ¶ 71.  As the PSR notes, Mr. Boice has "clearly demonstrated acceptance of responsibility," complied with all conditions of his pretrial release, and timely notified the government of his intention to enter a plea of guilty.  PSR ¶¶ 13, 84.

Since his arrest, Mr. Boice has returned to being the person he had always been before: a hard-working and caring family man, who enjoys close relationships

with his parents and children.  He returned to the workforce, and, despite the overwhelming debts he now faces, has continued to support his children financially. And those who have spent time with Mr. Boice since the offense comment on his reconnection to religion, which had been significant in his upbringing.  *See, e.g.,* ex. 1 at 7 ("Danny has a strong faith in God and is humbled, embarrassed, and has expressed intense remorse for his actions."); *see also id.* at 3, 5.  As his father explains, "Danny has learned [] that money is not the key to joy and fulfillment in life.  Relationships and loyalty to our Creator are far, far more important.  I believe that he fully understands that by now."  Ex. 1 at 5.  Similarly, his ex-wife Joanne explains that Mr. Boice's "redemption" is best illustrated by the way he explained his legal peril to his children: "he wanted to be the one to tell them" that he "broke the law," telling them that he would have to suffer the consequences, including going to prison, for doing so.  *Id.* at 1-2.

Of course, none of the forgoing excuses Mr. Boice's conduct.  He has pleaded guilty and agreed to pay full restitution with full knowledge of the likely result: he will emerge from prison in his mid- to late-40s and must start life over again in a position most of us cannot fathom.  He has lost the business that he put everything into and his professional reputation has been irreparably damaged by the widely-publicized downfall of Trustify in both the local and national press.  *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position, reputation, and widespread media coverage of his case); *United States v. Anderson*, 533 F.3d 623, 633

(8th Cir. 2008) (affirming departure based on how defendant "suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Redemann*, 295 F. Supp. 2d 887, 896–97 (E.D. Wis. 2003) (defendant already punished by losing his business because of conviction); *United States v. Gaind,* 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (same).

Having agreed to pay full restitution, Mr. Boice faces a nearly insurmountable debt that "virtually guarantees" he "will be making substantial restitution payments for the rest of his life." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (granting substantial downward variance for securities fraud). "So far as monetary sanctions are concerned, therefore, the Court did indeed impose a life sentence." *Id.*; *see also United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming downward variance in insider trading case for a defendant who was "50 years old and supports college-aged children," because he "lost his high paying job and has been forced to relocate to obtain any employment in his field and only then at a significantly reduced salary… [with] an uphill battle to regain his professional credibility."). These collateral consequences– above and beyond the prison sentence and period of supervised release Mr. Boice will serve–will dramatically alter the course of his life, and are relevant to this Court's sentencing determination.

In sum, Mr. Boice's early and unequivocal acceptance of responsibility, the collateral consequences he will face as a result of his conviction, his otherwise clean

criminal record, and the clear-headed insight he has shown into his misconduct all support a sentence below the advisory sentencing range.

B. **The Guidelines' Loss Enhancement Does Not Provide Meaningful Guidance in High-Dollar Fraud Cases**

Mr. Boice's advisory guideline range is driven almost entirely by a single enhancement for loss under U.S.S.G. § 2B1.1. The loss enhancement results in a *twenty-level increase* to his base offense level, nearly quadrupling his offense level from a base level of seven. Without minimizing the seriousness of Mr. Boice's conduct, nor the harm it caused, Mr. Boice respectfully submits – as many courts and commentators around the country have found – that this enhancement results in an advisory sentence beyond what is necessary to achieve the ends of justice.

The failure of the loss enhancement to meaningfully guide sentencing in white-collar offenses (particularly those involving large loss amounts) is well documented. *See United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) ("The widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases…") (Underhill, J., concurring). The dramatic increase in sentencing levels for the loss enhancement absent any empirical basis has drawn scorn from the courts and commentators alike. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d at 506, 509 (S.D.N.Y. 2006) (noting the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss… without, however, explaining why it is appropriate to accord such huge weight to such factors"). The loss enhancement has been widely criticized for its failure to provide a meaningful measure of the need for sentencing which has

-15-

resulted in judges being "increasingly willing to go below the guidelines when they impose sentences in white-collar cases." *United States v. Musgrave*, 647 F. App'x 529, 538–39 (6th Cir. 2016); *see also United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (criticizing the "overly-rigid loss table," and noting that "[i]n many cases… the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

The enhancement's shortcomings are particularly acute in high-loss cases such as this. Indeed, the Sentencing Commission itself stated that research "has led us to believe that the fraud guideline may not be fundamentally broken for most forms of fraud. [Economic crime] sentences on average hew fairly closely to the guidelines *for all but the highest dollar values, over $1 million in loss.*" Chief Judge Patti B. Saris, Chair, U.S. Sentencing Commission, Remarks for Public Meeting of USSC (Jan. 9, 2015) (emphasis added). It is therefore unsurprising that "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169 (Feb. 2008).

Moreover, empirical research has continued to show that, while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels… reached that conclusion, as has every major survey of the evidence."

*Id.* at 28–29.  This is particularly true in the context of white-collar offenses.  *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Those concerns apply equally here.  This case involved a legitimate company, and its failure was not solely a result of fraud.  Unlike a Ponzi scheme, where an entity was founded with the primary purpose of defrauding investors, Trustify was a real company that employed real people and created a real service utilized by thousands of real customers.  It ultimately failed and its investors lost their money, but its failure resulted in part from the business's failure – and also, of course, as a result of Mr. Boice's criminal conduct.  Under these circumstances, a twenty-level enhancement overstates the need for sentencing because it assumes, as in the case of a Ponzi scheme, that the loss was entirely attributable to fraud.

No other enhancement in U.S.S.G. § 2B, the section applicable to Mr. Boice, provides for anything near a 20-level upward adjustment.  In § 2A, governing violent crimes, there are no double-digit enhancements.  Examples of other double-digit enhancements in the Guidelines include a 15-level enhancement for trafficking in portable rockets (2K2.1(b)(3)(A)) and for boarding airplanes with bombs (§ 2K1.5(b)(1)), and 12-level enhancements for committing a felony to promote terrorism (§ 3A1.4(a)) and for obstruction of justice related to terrorism

(§ 2J1.2(b)(1)(C)); if a victim of sexual assault is under 12 years old, the resulting enhancement is four offense levels (§ 2A3.4(b)(1)).

Given the failure of U.S.S.G. § 2B1.1 to provide meaningful guidance in high-dollar fraud cases, this Court should look to the other § 3553(a) factors – such as the sentences imposed in similar cases, discussed below – in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

### C. A 60-Month Sentence Would be Consistent With Sentences Imposed on Similarly Situated Offenders in the Eastern District

While the Court must consider many factors in determining the appropriate sentence in any case, the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)) is particularly salient where, as here, the range proposed by the Guidelines is not reflective of the sentences actually imposed upon similarly situated defendants.

In *United States v. Manafort*, for example, the defendant was sentenced to 47 months after being found guilty, at trial, of defrauding banks of $25 million, hiding $55 million abroad, and failing to pay more than $6 million in taxes. *United States v. Manafort*, 1:18-cr-00083 (TSE) (E.D.Va. 2019). Unlike Mr. Boice, Mr. Manafort did not accept responsibility—to the contrary, he took the case to trial and never evinced contrition for his offenses. *See also United States v. Perry*, 2:13-cr-156-001 (E.D.V.A. 2015) (imposing sentence of 63 months in fraud case based on Guideline range of 235–293 months despite defendant going to trial, committing perjury, and failing to accept responsibility).

In 2019, the court in *United States v. Lexier* imposed a 26-month sentence upon the CEO of a company engaged in a wide ranging scheme which distributed $30 million worth of fraudulent pharmaceuticals. *United States v. Lexier*, 1:14-cr-00397-4 (AJT) (E.D.Va. 2019). According to the government, "Lexier was an organizer and leader of a sophisticated and massive criminal organization and knowingly endangered tens of thousands of American patients through the importation of misbranded and unregulated distribution of pharmaceuticals." 1:14-cr-397, ECF No. 264 at 2. Following application of the 20-level loss enhancement under 2B1.1(b)(1)(K), the Guidelines recommended a sentence of between 87 and 108 months.

In *United States v. Klekamp*, the defendant was sentenced to 51 months following his guilty plea to bank fraud with a loss of $ 10.5 million. *United States v. Klekamp*, No. 3:16-cr-141 (E.D.Va. 2017) (HEH). Similar to Mr. Boice's conduct, Mr. Klekamp made a number of false representations about the success of his company in order to induce the bank to provide a loan that the defendant knew could not be repaid. Largely owing to the loss enhancement, the sentencing Guidelines recommended a range of 70-87 months.

These examples are not anomalous. Perhaps in recognition of the failures of the sentencing guidelines in high-loss white collar offenses discussed above, judges in this district have routinely granted substantial downward variances from the guidelines in such cases. *See, e.g. United States v. Collinsworth*, 1:13-cr-185-2 (E.D.Va. 2013) (LO) (defendant sentenced to 18 months upon guilty plea to major

government fraud with losses of more than $ 7 million and Guideline range of 51–63 months); *United States v. Gezachew*, 1:10-cr-199 (E.D.Va. 2010) (LMB) (sentencing defendant to 30 months for bank fraud with loss of $18 million and Guideline range of 78-97 months); *United States v. Richards*, 1:13-cr-76 (E.D. Va. 2013) (LMB) (sentencing defendant to 27 months for conspiracy to commit major fraud against the United States with fraud loss of more than $ 7 million and Guideline range of 57–71 months); *United States v. Stone*, 1:14-cr-127 (E.D.Va. 2015) (CMH) (sentencing defendant, who went to trial and was convicted of mortgage fraud, to 60 months where court found properly-calculated Guideline range to be 78-97 months).

No two cases, of course, are alike. But Mr. Boice's case—a non-violent first-time offense subject to a loss enhancement that dwarfs the base offense level—bares many of the features that undergird the substantial variances granted in the above cases. A variance sentence of 60 months is consistent with sentences imposed in those cases.

### III. **Conclusion**

For all the reasons set forth above, Mr. Boice submits that a sentence of 60 months is both consistent with the sentences imposed upon like offenders and sufficient but not greater than necessary to achieve the goals of sentencing in this case. He has also agreed to pay over $18 million in restitution, and for that reason submits that the Court should not impose any punitive fine.

Further, in light of his compliance with the conditions of his pretrial release, Mr. Boice submits that he should be permitted to self-report to serve his term of

incarceration, and requests that he be ordered to do so no earlier than June 1, 2021. This will allow him sufficient time to get vaccinated against COVID-19 (for which he has registered but is not yet eligible), and to finish the current software contract on which he is working (which will allow him to make a substantial payment toward child support).

Finally, Mr. Boice requests that the Court recommend that he be designated to FPC Pensacola, which is near his current residence and easily reachable for his children and other family to visit; in the alternative, he requests a recommendation for FCI Morgantown, which would also be relatively easy for his family and children to visit.

Respectfully Submitted,

DANIEL BOICE
By Counsel,

Geremy C. Kamens
Federal Public Defender


_____/s/_____
Todd M. Richman
Va. Bar No. 41834
Counsel for Mr. Boice
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0845
Facsimile: (703) 600-0880
Todd_Richman@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2021, I filed the foregoing via the CM/ECF system, which will electronically serve a copy upon all counsel of record.

A courtesy copy of this Memorandum will also be delivered to chambers within one business day of the electronic filing.  Further, a copy of this Memorandum will be served via electronic mail upon Senior United States Probation Officer Kelly M. Smihal.

_____/s/_____
Todd M. Richman
Va. Bar No. 41834
Counsel for Mr. Boice
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0845
Facsimile: (703) 600-0880
Todd_Richman@fd.org
