IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

FILED
MAILROOM

DEC 1 2 2024

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

DANIEL BOICE,

Defendant.

Case No. 1:20-cr-167-MSN

---

# DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO

# MOTION FOR COMPASSIONATE RELEASE

---

## I. Introduction

Defendant Daniel Keith Boice respectfully submits this reply to address and refute the arguments raised in the government's opposition to his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). This reply highlights recent developments, corrects misrepresentations, and underscores the extraordinary and compelling circumstances justifying Defendant's immediate release or home confinement.

**Key Developments Supporting Compassionate Release:**

1. **Reclassification to Care Level 3:**

   The Bureau of Prisons (BOP) recently reclassified Defendant's medical care level from 2

to 3, affirming the severity of his health conditions and systemic neglect. This change directly contradicts the government's assertion of adequate care and underscores the urgent need for judicial intervention.

2. **Projected Home Confinement Release Date:**

Based on the latest First Step Act time credit calculations, Defendant's home confinement release date has been updated to be within 12 months, in December 2025. Defendant requests a modest adjustment of 12 months, advancing this date to December 2024, to avoid the severe risks posed by systemic neglect and inadequate medical care at FCC Butner.

3. **Untreated and Worsening Health Conditions:**

Defendant has suffered a sudden and unexplained 45-pound weight loss, a dangerously enlarging prostate, and worsening complications from Chronic Immune Thrombocytopenic Purpura (ITP), hypertension, chronic high cholesterol, and a single kidney. These conditions remain untreated, presenting a daily, life-threatening risk.

4. **Misaligned Custody and Security Placement:**

Despite Judge Ellis's sentencing recommendation for minimum-security placement and Defendant's custody score of 6, the BOP has housed him at FCI Butner Low—a higher-security facility—exposing him to unnecessary risks and limiting access to reentry preparation.

5. **Staff Misconduct and Systemic Failures:**

Misconduct by Officer D. Ford, including fabricated disciplinary charges, highlights systemic failures at FCC Butner. Though Ford was temporarily suspended after an

investigation, he continues to work near Defendant, perpetuating a dangerous and hostile environment.

6. **Low Risk to Public Safety:**

   Defendant's recidivism score is zero, and he has demonstrated extraordinary rehabilitation through vocational training, financial responsibility programs, and faith-based initiatives. These efforts further confirm his readiness for reintegration and the absence of any public safety threat.

7. **Convergence of Extraordinary Factors and Systemic Failures Necessitate Judicial Intervention:**

   The combination of untreated and worsening health conditions, misaligned custody placement, systemic staff misconduct, and systemic failures at FCC Butner creates an unprecedented life-threatening emergency. Each factor individually aligns with a relevant § 3553(a) factor and justifies compassionate release under law. However, their convergence presents an urgent, life-and-death situation that requires immediate judicial intervention to prevent Defendant from becoming another statistic in FCC Butner's 25% death rate among BOP inmates.

Defendant's circumstances align with 18 U.S.C. § 3582(c)(1)(A) and the Court's consistent emphasis on fairness, proportionality, and individualized assessments. This reply builds upon these principles, demonstrating why compassionate release is the appropriate remedy.

## I. Key Developments

*1. Reclassification to Care Level 3*

### a. Summary

The Bureau of Prisons (BOP) Central Office has reclassified Defendant to Care Level 3, acknowledging the chronic and life-threatening nature of his medical conditions. This reclassification is reserved for inmates requiring frequent clinical contacts and specialized care, and it highlights the systemic failures in Defendant's prior medical treatment at FCC Butner Low. Despite this reclassification, the medical care provided by Butner staff remains wholly inadequate and unchanged. The failure to address Defendant's Chronic Immune Thrombocytopenic Purpura (ITP), chronic hypertension, high cholesterol, single kidney, and new developments such as unexplained 45-pound weight loss and a dangerously enlarging prostate demonstrates systemic neglect. These failings directly refute the Government's claim that Defendant's medical needs are adequately managed.

### b. Legal Precedents Supporting Medical Reclassification as Extraordinary and Compelling

Courts have consistently recognized that systemic failures in providing adequate medical care constitute extraordinary and compelling circumstances under § 3582(c)(1)(A):

- **United States v. Mangarella**, 57 F.4th 197, 200 (4th Cir. 2023): Held that systemic healthcare inadequacies within the BOP, particularly when coupled with chronic conditions, can justify compassionate release. The court emphasized the need for individualized medical assessments, which the BOP failed to provide to the Defendant for nearly four years.

- **United States v. Beck**, 425 F. Supp. 3d 573, 577 (M.D.N.C. 2019): Granted release due to systemic delays and inadequate care, underscoring the risks posed to inmates with chronic or life-threatening conditions.

- **United States v. Davis**, 62 F.4th 212, 216 (4th Cir. 2024): Stated that incarceration incompatible with an inmate's health needs due to systemic neglect constitutes grounds for compassionate release.

- **United States v. Colvin**, No. 3:19-cr-179, 2020 WL 1613943 (D. Conn. Apr. 2, 2020): Emphasized that institutional failures to address worsening medical conditions justified relief.

- **United States v. Daniels**, No. 2:17-cr-00196 (E.D. Va. Mar. 18, 2021): Highlighted systemic deficiencies at FCI Butner Low as extraordinary and compelling grounds for release.

## c. Details

The reclassification was issued after the BOP Central Office reviewed Defendant's medical records and determined that his previous designation as Care Level 2 was erroneous. The reclassification validates Defendant's long-standing claims of systemic medical neglect at FCI Butner Low, where serious conditions such as:

1. **Chronic Immune Thrombocytopenic Purpura (ITP):** A life-threatening autoimmune disorder causing dangerously low platelet counts, untreated for nearly four years.

2. **Chronic Hypertension and High Cholesterol:** Managed only minimally without regular follow-ups or proper monitoring.

3. **Single Kidney:** A unique vulnerability that increases the risk of fatal complications from even minor injuries.

4. **Unexplained Weight Loss:** A recent development involving a sudden 45-pound weight reduction (nearly 25% of Defendant's body weight), which remains undiagnosed. This issue was brought to light in the Government's opposition, based on recent medical records that Defendant does not have access to.

5. **Enlarging Prostate:** A progressive condition causing urinary complications, untreated despite its documented severity.

Despite the reclassification, Defendant's medical care remains unchanged. No specialist consultations, diagnostic testing, or treatment plans have been initiated. Furthermore, the reclassification halted Defendant's transfer to SCP Petersburg, a minimum-security facility closer to his family, compounding the harm caused by his continued placement at Butner.

**d. Request for Court Action**

Defendant respectfully requests that the Court order the BOP to produce all relevant documents under seal, including:

1. The memo and records related to Defendant's reclassification.

2. Internal communications detailing the reasons for the reclassification and subsequent care plans.

3. Recent medical records relied upon by the Government in their opposition, which Defendant has not been permitted to access.

This documentation will allow the Court to verify the severity of Defendant's conditions, assess the systemic neglect at FCC Butner, and evaluate the urgent need for compassionate release.

**e. Conclusion**

6

Defendant's reclassification to Care Level 3 confirms the severity of his chronic and life-threatening medical conditions, as well as the systemic failures in his care at FCC Butner Low. The Government's attempt to weaponize Defendant's unexplained weight loss, highlighted in their opposition, only underscores the inadequacy of his medical treatment and the urgency of judicial intervention. These circumstances, combined with Defendant's unique vulnerabilities, constitute extraordinary and compelling reasons justifying compassionate release or immediate home confinement.

This case exemplifies the principles articulated in **United States v. Mangarella, United States v. Beck,** and **United States v. Davis**, where courts emphasized the necessity of individualized assessments and the acknowledgment of systemic healthcare failures. Judicial intervention is necessary to ensure Defendant receives the care he urgently requires and to prevent further harm.

### 2. Projected Home Confinement Release Date

#### a. Updated Release Date

Defendant's case manager has recalculated his projected release to home confinement to December 2025, based on accumulated credits and statutory provisions, including:

- **Good Conduct Time (GCT):** Credits earned for exemplary behavior during incarceration, calculated under 18 U.S.C. § 3624(b).

- **First Step Act (FSA) Time Credits:** Under the FSA, inmates can earn time credits for participating in recidivism reduction programs and productive activities, potentially

reducing their sentence duration. See First Step Act of 2018, Pub. L. No. 115-391, § 102, 132 Stat. 5194, 5196–5202.

- **Second Chance Act Provisions:** This act enhances reentry opportunities, including expanded home confinement options. See Second Chance Act of 2007, Pub. L. No. 110-199, § 251, 122 Stat. 657, 692–94.

The Bureau of Prisons (BOP) calculates future FSA time credits at a rate of 15 days per month, projecting the intersection of these credits with the calendar date to result in home confinement eligibility around December 2025 or January 2026, depending on specific BOP calculations. Defendant's motion for compassionate release seeks a modest adjustment of 12 months, advancing this date to December 2024.

Notably, case management staff have declined to provide inmates with hard copies of these recalculations, opting instead for individual meetings to communicate updated release dates from their computer systems. This practice limits inmates' access to critical information regarding their incarceration and release timelines. See U.S. Dep't of Just., Off. of the Inspector Gen., Review of the Federal Bureau of Prisons' Management of Inmate Placements in Residential Reentry Centers and Home Confinement (Nov. 2016), available at https://oig.justice.gov/reports/2016/e1603.pdf.

### b. Minimal Reduction with Significant Impact

Advancing the release date by 12 months would:

- **Facilitate Immediate Access to Specialized Medical Care:** Defendant suffers from Chronic Immune Thrombocytopenic Purpura (ITP), kidney function issues, hypertension,

and high cholesterol—conditions inadequately managed at FCC Butner Low. Immediate release would enable access to specialized medical care necessary for these conditions.

- **Mitigate Elevated Infection Risks:** The absence of a spleen significantly increases Defendant's susceptibility to infections, a risk compounded by systemic healthcare deficiencies at FCC Butner.

- **Reduce Exposure to High Mortality Rates:** FCC Butner accounts for 25% of all BOP inmate deaths, highlighting the life-threatening risks of continued incarceration there. See U.S. Dep't of Just., Off. of the Inspector Gen., Review of the Federal Bureau of Prisons' Medical Care and Mortality Reporting (June 2021), available at https://oig.justice.gov/reports/2021/e2106.pdf.

- **Align with 18 U.S.C. § 3553(a)(2)(D):** This statute emphasizes the necessity of providing adequate medical care and humane treatment to inmates.

A 12-month reduction equitably balances the interests of justice with the extraordinary and compelling circumstances of Defendant's health and rehabilitation needs.

### c. Supporting Case Law

Courts have recognized that proximity to release, combined with extraordinary circumstances, justifies compassionate release:

- **United States v. Rodriguez**, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020): Proximity to release is a significant factor in granting compassionate release, especially when continued incarceration offers diminished benefits.

- **United States v. Ebbers,** 432 F. Supp. 3d 421, 430 (S.D.N.Y. 2020): The reduced benefit of continued incarceration as an inmate nears release supports compassionate release.

- **United States v. Perez**, 451 F. Supp. 3d 288, 293 (S.D.N.Y. 2020): Emphasized the importance of humane treatment and the necessity of compassionate release as an inmate approaches release, particularly amid systemic inadequacies.

### d. Additional Considerations

Defendant's unique medical vulnerabilities underscore the urgency of an adjusted release date:

- **Unexplained Weight Loss:** The Government acknowledges Defendant's significant weight loss in its opposition, referencing recent medical records inaccessible to Defendant. This condition, alongside existing health issues, necessitates prompt and specialized medical attention.

- **Enlarged Prostate:** Although not mentioned by the Government, Defendant suffers from an enlarging prostate, further complicating his health status.

- **Eighth Amendment Concerns:** Compassionate release would allow Defendant to receive necessary medical care, aligning with the Eighth Amendment's prohibition against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 103 (1976) (holding that deliberate indifference to inmates' serious medical needs violates the Eighth Amendment).

### e. Conclusion

Advancing Defendant's release date by 12 months would provide access to essential medical care, mitigate systemic neglect risks, and ensure humane treatment as mandated by 18 U.S.C. §

3553(a) and § 3582(c)(1)(A). This adjustment respects the gravity of Defendant's offense and upholds the sentence's integrity, serving justice and fairness in light of his extraordinary medical needs and imminent release.

### 3. *Untreated and Worsening Health Conditions*

#### a. **Summary**

Defendant's severe and unexplained weight loss of 45 pounds—representing approximately one-fourth of his body weight—is a key development in this case. This significant and alarming health issue was brought up by the Government in their opposition, not as a legitimate concern for Defendant's well-being, but in an attempt to weaponize it against him. The Government's indifference to the underlying cause of this weight loss and its decision to use it as an attack reflects the same systemic neglect and callous disregard that Defendant experiences daily from FCC Butner's medical staff.

This pattern of passive indifference or active neglect by both the Government and Butner's medical staff underscores the extraordinary and compelling circumstances justifying compassionate release under § 3582(c)(1)(A). Defendant also continues to face life-threatening risks from untreated Chronic Immune Thrombocytopenic Purpura (ITP), prostate enlargement, chronic hypertension, high cholesterol, and the complications of having a single kidney and no spleen.

#### b. **Legal Precedents Supporting Medical Neglect as Extraordinary and Compelling**

Courts have consistently recognized that institutional neglect and systemic healthcare failures constitute extraordinary and compelling circumstances for compassionate release:

- **United States v. Beck**, 425 F. Supp. 3d 573, 577 (M.D.N.C. 2019): Found that systemic delays in addressing serious medical conditions created extraordinary circumstances warranting release.

- **United States v. Mangarella**, 57 F.4th 197, 200 (4th Cir. 2023): Held that systemic healthcare failures, especially where medical vulnerabilities were exacerbated, justify relief under § 3582(c)(1)(A).

- **United States v. Daniels**, No. 2:17-cr-00196, at *4–5 (E.D. Va. Mar. 18, 2021): Recognized the combination of chronic medical needs and institutional neglect as sufficient grounds for compassionate release.

- **United States v. Clark**, 451 F. Supp. 3d 651, 655 (M.D. La. 2020): Emphasized that systemic delays in addressing critical health issues can justify compassionate release.

These cases demonstrate that neglect of severe and life-threatening medical conditions violates the principles of humane treatment and the requirements of 18 U.S.C. § 3553(a)(2)(D).

c. **Details of Defendant's Untreated Conditions**

1. **Unexplained Weight Loss:**

- Defendant has lost approximately 45 pounds (nearly 25% of his body weight) within a few months. This severe and unexplained weight loss raises the possibility of undiagnosed cancer or other life-threatening conditions.

- The Government highlighted this weight loss in their opposition, not to advocate for proper medical care, but to attempt to discredit Defendant's motion. This lack of concern is emblematic of the indifference Defendant faces daily.

- FCC Butner's medical staff has not conducted any diagnostic testing or follow-up for this condition, leaving the cause of this significant weight loss unresolved.

- *See United States v. Beck*, 425 F. Supp. 3d at 577, where delays in investigating and treating serious medical conditions were found to justify compassionate release.

2.    **Enlarging Prostate:**

- Defendant's prostate enlargement has caused urinary complications, increasing risks of infection and kidney damage.

- FCC Butner has failed to provide any specialist evaluations or diagnostic follow-up for this condition, despite its progressive and potentially life-threatening nature.

3.    **Chronic ITP and Single Kidney:**

- Chronic ITP causes platelet counts to drop dangerously low, leaving Defendant at risk of fatal internal bleeding.

- The combination of Chronic ITP and a single kidney amplifies the dangers posed by physical trauma, particularly in FCC Butner's violent environment.

- Despite being classified as Care Level 3, Defendant has not received adequate monitoring or treatment for these conditions, violating BOP obligations under Program Statement 6090.04.

4.    **Chronic Hypertension and High Cholesterol:**

- Both conditions were noted during Defendant's intake in 2021 but have been inadequately treated. Defendant has not received regular follow-ups, medication adjustments, or monitoring in over two years.

- Untreated hypertension and high cholesterol significantly increase the risks of heart disease, stroke, and other life-threatening conditions.

5.  **Lack of a Spleen:**

- Defendant's splenectomy renders him highly susceptible to infections. The crowded and unsanitary conditions at FCC Butner, combined with systemic medical neglect, place him at grave risk.

**d. Conclusion**

Defendant's worsening and untreated health conditions—including the alarming weight loss, prostate enlargement, Chronic ITP, hypertension, high cholesterol, and the complications of having a single kidney and no spleen—constitute extraordinary and compelling circumstances for compassionate release.

The Government's cavalier attitude in highlighting Defendant's weight loss without acknowledging its medical implications reflects the same systemic indifference that Defendant faces from FCC Butner's medical staff. This neglect violates **18 U.S.C. § 3553(a)(2)(D)**, which mandates the provision of necessary medical care. Judicial intervention is necessary to ensure Defendant receives the humane treatment required under the law.

14

Advancing Defendant's release to home confinement would allow immediate access to private medical care, mitigating the risks of further neglect and ensuring compliance with the principles of justice and fairness under § 3582(c)(1)(A).

### 4. *Misaligned Custody and Security Placement*

**a. Summary**

Defendant's placement at FCI Butner Low, a higher-security institution, directly contradicts his custody classification score of 6 and "Out" custody designation, which place him squarely in the minimum-security range. This misalignment has exposed Defendant to undue risks, including unprovoked attacks that could prove fatal due to his unique medical vulnerabilities, and deprived him of opportunities for family support and reentry preparation.

**b. Legal Precedents Supporting Proper Custody Placement**

Courts have consistently recognized that misaligned custody placements, particularly those exposing inmates to unnecessary risks, constitute extraordinary and compelling circumstances for compassionate release:

- **United States v. Bellamy**, No. 3:12-cr-19-FDW, 2021 WL 1381231, at *3 (W.D.N.C. Apr. 12, 2021): Found heightened risks from improper placements sufficient to justify compassionate release.

- **United States v. Davis**, 62 F.4th 212, 216 (4th Cir. 2024): Emphasized the systemic failures in ensuring inmate safety as grounds for release.

- **United States v. Beck**, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019): Highlighted the importance of aligning custody placements with inmates' security and medical needs.

- **United States v. Handy**, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021): Held that systemic mismanagement of inmate classifications and placements warranted judicial intervention.

- **United States v. Mangarella**, 57 F.4th 197, 200 (4th Cir. 2023): Highlighted the importance of individualized assessments in custody placements to avoid exacerbating medical vulnerabilities.

## c. Details

1. **Judge Ellis's Sentencing Recommendation:**

   Judge Ellis explicitly recommended placement in a minimum-security facility, recognizing Defendant's low-risk classification and medical needs. Despite meeting all criteria for minimum-security placement, the BOP has confined Defendant at FCI Butner Low, a higher-security institution. This misalignment violates BOP Program Statement 5100.08, which mandates placement aligned with an inmate's custody classification and security needs.

2. **Exposure to Violence:**

   The Government's opposition highlights an unprovoked attack on Defendant but misses the critical point: this attack could have killed Defendant given his Chronic Immune Thrombocytopenic Purpura (ITP) and single kidney. If Defendant's ITP had been active, the assault could have caused fatal internal bleeding or a cerebral hemorrhage. Similarly, if the single kidney had been ruptured during the assault, the outcome would have been

catastrophic. These risks underscore the unique vulnerability Defendant faces and the
systemic failures that place him at heightened danger. Courts have repeatedly emphasized
that inmates with unique vulnerabilities warrant heightened protections (*United States v.
Beck*, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019)).

3. **Segregated Housing Unit (SHU):**

Following the attack, Defendant was placed in FCC Butner's shared SHU, which houses
inmates of all security levels together across the complex. This dangerous arrangement
violates BOP guidelines and subjects inmates like Defendant to significant risks. Just last
month, an inmate housed in the SHU was beaten to death in his cell, underscoring the
unsafe conditions and lack of oversight in this environment. These risks are particularly
concerning for Defendant, whose medical vulnerabilities make him uniquely susceptible
to fatal injuries. The systemic failures of SHU arrangements have been noted in
investigative reports highlighting the BOP's inability to maintain safe conditions in
mixed-security settings (*DOJ OIG Report: Review of the Federal Bureau of Prisons'
Monitoring of Inmate Isolation Policies*, 2021).

4. **Denial of Transfer to SCP Petersburg by BOP Central Office Medical:**

Defendant was eligible for transfer to SCP Petersburg, a minimum-security facility closer
to his family. However, during the routine medical review required as part of the transfer
process, BOP Central Office Medical reviewed Defendant's medical records and
immediately flagged serious issues overlooked by Butner's medical staff. Central Office
identified that Defendant had been misclassified as Care Level 2 despite clear evidence
supporting Care Level 3 designation. This discovery halted the transfer process entirely,
and Defendant's care level was subsequently upgraded to Care Level 3.

- The internal memo explaining this decision was read to Defendant by his case manager. This abrupt recognition of Butner Medical's failure underscores the systemic neglect Defendant has endured and further highlights the need for judicial intervention. Despite the care level upgrade, Defendant remains at FCI Butner Low, where his medical needs continue to go unmet, and the risks associated with improper placement persist.

5. **Limited Care Level 3 Camp Placement Options:**

As a Care Level 3 inmate, Defendant faces severely limited options for camp placement, with no available minimum-security facilities close to his family and release address. This lack of viable alternatives leaves Defendant effectively trapped at the Butner complex, where systemic neglect and risks to his safety persist. Courts have recognized that the absence of appropriate placement options can constitute extraordinary circumstances warranting judicial relief (*United States v. Handy*, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021)).

6. **Threats and Retaliation by CO Ford:**

Defendant is further endangered by the continued presence of CO Ford, who works at both FCI Butner Low and the adjacent minimum-security SCP. Ford has a documented history of assaults and retaliation, including attempts to incite inmate violence against Defendant. With Defendant effectively confined to the Butner complex until release, Ford's presence exacerbates the risks to Defendant's safety and underscores the systemic failures that have placed him in this precarious situation. The DOJ OIG has previously documented systemic issues regarding officer misconduct within the BOP, highlighting the failure to prevent retaliation and abuse by staff (*DOJ OIG Report: Review of Allegations of Staff Misconduct at Bureau of Prisons Facilities*, 2022).

7.    **Barriers to Reentry Preparation:**

Defendant's placement at a higher-security facility has denied him access to family support, vocational programming, and other resources critical for successful reintegration. These barriers directly contradict § 3553(a)(2)(D), which emphasizes the need to provide correctional treatment and support in the most effective manner.

**d. Conclusion**

The systemic failures in aligning Defendant's custody classification and placement have resulted in undue risks and harsher conditions than warranted. These failures contradict BOP guidelines, judicial recommendations, and the principles of fairness and proportionality under **18 U.S.C. § 3553(a).**

Immediate corrective action through compassionate release or home confinement is necessary to mitigate these harms. Realigning Defendant's custody to a minimum-security facility—or granting compassionate release—would address the systemic neglect and ensure compliance with statutory obligations under **18 U.S.C. § 3582(c)(1)(A).** Judicial intervention is warranted to safeguard Defendant's safety and promote the rehabilitative and reentry objectives Congress intended.

**5. Staff Misconduct and Systemic Failures**

*a. Summary*

Defendant has endured egregious misconduct by Officer D. Ford at FCI Butner Low. Ford's documented fabrication of disciplinary charges against Defendant represents a severe breach of

due process and highlights systemic failures within the Bureau of Prisons (BOP). While an investigation led to Ford's suspension and Defendant's exoneration, Ford's continued employment and presence at Butner perpetuate a hostile and dangerous environment for Defendant. These actions, combined with a pattern of intimidation and retaliation by other staff, underscore the urgent need for judicial intervention.

*b. Documented Misconduct by Officer D. Ford*

1. **Fabricated Charges:**

    Earlier this year, Officer Ford falsified federal incident reports and chain-of-custody documents, fabricating a serious infraction against Defendant. These falsifications required the signature and approval of senior staff, who either failed to conduct due diligence or knowingly participated in this misconduct. The fabricated charges, if successful, would have unjustly added years to Defendant's sentence, disqualified him from safer custody placement, and significantly delayed his reintegration efforts.

2. **Investigation and Suspension:**

    Following a campaign of letters, emails, and phone calls from Defendant's family and friends to elected officials and BOP leadership, an investigation by the BOP Central Office and Regional leadership uncovered that Ford had fabricated the entire incident out of a personal vendetta. While the investigation exonerated Defendant and led to Ford's temporary suspension, he has since returned to a senior position at Butner, continuing to pose a direct threat to Defendant's safety and well-being.

3. **Threats and Intimidation:**

    After exposing Ford's misconduct, Defendant faced further retaliation and intimidation.

Other staff warned Defendant to "just take it and don't make any waves" and that "you know what Ford will do to you." Staff even attempted to provoke inmate violence against Defendant by falsely labeling him as a "rat" or "snitch"—a tactic widely known to endanger inmates in federal facilities. This deliberate targeting created an ongoing, hostile environment, exacerbating Defendant's medical vulnerabilities and psychological stress.

4. **Systemic Implications:**

Ford's misconduct is emblematic of broader systemic failures at FCC Butner, where staff misconduct, unchecked abuse, and lack of accountability have created a pervasive culture of hostility and neglect. Ford's continued employment, despite his documented actions, exemplifies the institutional failure to protect inmates from known threats.

### c. Legal Precedents Addressing Staff Misconduct

Courts have recognized that staff misconduct and systemic failures constitute extraordinary and compelling circumstances under § 3582(c)(1)(A):

- **Spencer v. Krause**, No. 17-2264, 2017 WL 2264855, at *2 (9th Cir. June 6, 2017): Fabricated evidence by a state official violates due process and undermines fairness.

- **Farmer v. Brennan**, 511 U.S. 825, 834 (1994): Prison officials have a constitutional obligation to protect inmates from known risks of harm.

- **United States v. Handy**, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021): Systemic staff misconduct can constitute extraordinary and compelling reasons for compassionate release.

### d. Systemic Failures to Address Staff Misconduct

1. **Broader Patterns of Abuse:**

   The DOJ's Office of the Inspector General (OIG) has repeatedly documented patterns of misconduct, lack of accountability, and inadequate oversight within BOP facilities, including FCC Butner. See DOJ Office of the Inspector General, *Review of the Federal Bureau of Prisons' Management Practices* (2021), https://oig.justice.gov/news/doj-oig-releases-reports-remote-inspections-fcc-butner-and-fci-milan-examining-institutions.

2. **Inmate Deaths and Violence:**

   Multiple incidents at FCC Butner underscore the consequences of systemic neglect and abuse. For instance, in February 2024, an inmate died under circumstances suggesting staff negligence. See Associated Press, *Inmate Death at FCC Butner Raises Concerns*, AP News, Feb. 22, 2024, https://apnews.com/article/1e5921befd3ae911228d81575feb639a.

3. **Violation of BOP Policies:**

   The BOP's own Program Statement 5270.09 on Inmate Discipline mandates impartiality, consistency, and the absence of retaliatory intent in disciplinary actions. Ford's actions, including fabricated reports, intimidation, and attempts to provoke inmate violence, directly contravene these principles.

4. **Lack of Accountability:**

   Despite Ford's documented misconduct, he remains employed at Butner in a senior role, where he has access to Defendant's housing unit and continues to create an unsafe

environment. This ongoing threat underscores the systemic failures within the BOP to address staff misconduct and ensure inmate safety.

### e. Request for Court Action

Defendant respectfully requests that the Court order the BOP to produce:

1. Officer Ford's personnel records, disciplinary history, and records related to the fabricated charges.

2. Internal communications and documentation regarding the investigation into Ford's misconduct.

Defendant also requests that these records be sealed to protect the privacy and integrity of the individuals involved.

### f. Conclusion

Officer Ford's actions constitute egregious violations of Defendant's due process rights and institutional safety standards. The fabrication of evidence, retaliation, and systemic failures at FCC Butner exemplify the hostile environment that has placed Defendant at continued risk. Judicial intervention is necessary to ensure Defendant's safety and to uphold the principles of justice and fairness. Compassionate release is the only remedy that can adequately address the ongoing threats posed by staff misconduct and systemic neglect.

## 6. Low Risk to Public Safety

### a. Summary

Defendant's "minimum custody" classification since 2021 and recent designation as "out custody" by FCI Butner case management staff underscore his exceedingly low likelihood of reoffending or posing a public safety threat. The "out custody" designation, which was communicated to Defendant by case management staff, is a key development that reflects the BOP's acknowledgment of his exemplary institutional conduct and readiness for reintegration.

The "out custody" designation is reserved for inmates deemed suitable for unsupervised community engagement, per **BOP Program Statement 5100.08**. This designation highlights Defendant's low public safety risk and readiness for a lower level of supervision. Despite this, Defendant remains confined at FCI Butner Low, a higher-security facility, due to systemic placement issues, which directly contradicts his custody classification and the BOP's own policies.

This designation further contradicts the government's opposition, which alleges ongoing risk without substantiating evidence, undermining their claims and highlighting the consistency of Defendant's exemplary institutional record.

### b. Custody Classification and Definitions

Defendant has consistently been classified as "minimum custody" since 2021. The BOP defines "minimum custody" as the lowest level of custody classification, reserved for inmates who pose minimal risk to the public and staff and require only basic institutional supervision.

The recent designation of "out custody" signifies an even lower level of supervision. Per **BOP Program Statement 5100.08**, "out custody" is assigned to inmates assessed as posing no risk to public safety when unsupervised in the community. This designation typically allows inmates to

participate in community work assignments or home confinement without direct supervision, reflecting their readiness for reintegration.

### c. Rehabilitation and Conduct

Defendant has achieved the following milestones, demonstrating his commitment to rehabilitation and public safety:

- Completion of vocational certifications, including construction safety and HVAC repair, equipping him with employable skills.

- Active participation in faith-based programs, financial responsibility courses, and parenting classes, underscoring his dedication to self-improvement.

- Maintenance of a negative recidivism score, consistent adherence to institutional rules, and fulfillment of all recommended programming since 2021.

### d. Legal Precedents Supporting Low Risk Designations

Courts have consistently recognized that BOP custody classifications are critical in assessing public safety risks and readiness for reintegration:

- **United States v. Handy**, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021): Found systemic misclassification and placement issues sufficient grounds for judicial intervention.

- **United States v. Rodriguez**, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020): Highlighted proximity to release and low public safety risk as extraordinary and compelling reasons warranting relief.

- **United States v. Beck**, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019): Emphasized the importance of aligning institutional placements with an inmate's risk level and reintegration readiness.

- **BOP Program Statement 5100.08**: Defines "out custody" as suitable for inmates who pose no public safety threat when unsupervised, directly supporting Defendant's eligibility for home confinement.

### e. Government Contradictions

The government's assertion of public safety risk is directly contradicted by the BOP's classification of Defendant as "minimum custody" since 2021 and "out custody" as recently confirmed by case management staff. This designation reflects a comprehensive review of Defendant's conduct, programming, and risk level, all of which affirm his readiness for reintegration. The government's argument ignores these critical developments and relies on speculative allegations that lack evidentiary support.

Furthermore, the BOP's assessment aligns with federal policy statements that prioritize home confinement for low-risk inmates nearing release. Courts have consistently recognized that such classifications carry significant weight in compassionate release considerations, particularly when proximity to release and systemic institutional failures are factors. For instance, in United States v. Rodriguez, the court acknowledged that a defendant's low security classification and proximity to release can constitute extraordinary and compelling reasons for compassionate release. See United States v. Rodriguez, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020) (recognizing that low-risk classification and approaching release date justify reduced incarceration under 18 U.S.C. § 3582(c)(1)(A)).

Additionally, the BOP's guidelines reflect this principle, as seen in its policies maximizing home confinement for inmates assessed as low risk and nearing the end of their sentences. See Fed. Bureau of Prisons, Off. of the Dir., OPI CPD/RS, Change Notice No. 001-2019, "Home Confinement Under the First Step Act" (2019), available at https://www.bop.gov/policy/om/001-2019.pdf.

Finally, Defendant's minimum recidivism score aligns with federal standards for low-risk inmates eligible for reduced supervision and community-based reentry initiatives. Courts have consistently emphasized the significance of such scores in evaluating compassionate release petitions, recognizing that low-risk classifications corroborate an inmate's readiness for reintegration and reduced threat to public safety. See United States v. Rodriguez, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020) (granting release where the defendant's recidivism score supported low risk and readiness for community integration); United States v. Handy, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021) (noting the defendant's low-risk classification as evidence of extraordinary circumstances).

The Defendant's placement at the lowest recitivism range possible by the BOP, further underscores his eligibility for community-based programs, home confinement, or compassionate release. BOP policy prioritizes such placements for inmates with exemplary conduct and minimal public safety risk, in line with federal recidivism reduction guidelines. See Fed. Bureau of Prisons, Off. of the Dir., OPI CPD/RS, Change Notice No. 001-2019, "Home Confinement Under the First Step Act" (2019), available at https://www.bop.gov/policy/om/001-2019.pdf.

*f. Conclusion*

Defendant's consistent "minimum custody" classification, recent "out custody" designation, lowest-rank recidivism score, and demonstrated rehabilitation conclusively establish his low public safety risk. These developments directly refute the government's opposition and align with the principles of fairness, proportionality, and individualized sentencing under **18 U.S.C. § 3553(a).**

Compassionate release is the appropriate remedy to allow Defendant to complete his sentence in a manner that respects his progress, medical needs, and minimal public safety risk. Judicial intervention is necessary to address the systemic contradictions and ensure decisions are grounded in fairness, evidence, and statutory mandates.

## 7. Convergence of Extraordinary Factors and Systemic Failures Necessitate Judicial Intervention

### a. Summary

The convergence of Defendant's extraordinary circumstances—untreated and worsening health conditions, systemic neglect, misaligned custody placement, staff misconduct, and proximity to release—presents an urgent and compelling case for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Each of these factors independently justifies judicial intervention. Together, they underscore broader systemic failures within the Bureau of Prisons (BOP) and demand immediate action to prevent further harm.

### b. Independent Justification of Each Factor

1. **Untreated and Worsening Health Conditions**

   Defendant suffers from Chronic Immune Thrombocytopenic Purpura (ITP), hypertension, a single kidney, and the absence of a spleen, leaving him uniquely vulnerable to life-threatening conditions. These conditions remain untreated despite Defendant's reclassification to Care Level 3. The unexplained 45-pound weight loss—acknowledged in the Government's opposition but dismissed as trivial—highlights the systemic neglect and indifference to Defendant's health. See *United States v. Beck*, 425 F. Supp. 3d 573, 577 (M.D.N.C. 2019) (granting compassionate release due to delays in treating life-threatening medical conditions).

2. **Reclassification to Care Level 3**

   The BOP Central Office's decision to reclassify Defendant to Care Level 3 validates the severity of his medical conditions and the systemic failures in his prior care. Despite this reclassification, Defendant remains at FCC Butner Low, where his medical needs continue to be neglected. This failure violates the BOP's statutory obligation under 18 U.S.C. § 3553(a)(2)(D) to provide medical care in the most effective manner.

3. **Misaligned Placement**

   Defendant has always been classified as minimum custody and was recently designated "Out" custody by Butner case management staff, signifying readiness for unsupervised community access. However, Defendant remains confined at FCC Butner Low, a higher-security institution, exposing him to unnecessary violence and depriving him of access to reentry programs. This misalignment directly contravenes BOP Program Statement 5100.08, which mandates housing aligned with an inmate's classification. See *United*

*States v. Bellamy*, No. 3:12-cr-19-FDW, 2021 WL 1381231, at *3 (W.D.N.C. Apr. 12, 2021) (granting compassionate release due to risks created by improper placement).

4. **Staff Misconduct**

Officer D. Ford's documented fabrication of disciplinary charges and attempts to provoke violence against Defendant exemplify the unsafe and hostile environment at FCC Butner. Despite a temporary suspension, Ford remains employed in a senior role at Butner, perpetuating threats to Defendant's safety. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (holding that prison officials have a constitutional obligation to protect inmates from known risks of harm).

5. **Proximity to Release**

Defendant is projected to transition to home confinement by December 2025, incorporating good time credits, First Step Act time credits, and Second Chance Act provisions. Advancing this date by 12 months through compassionate release aligns with the principle of proportionality under § 3553(a) and allows Defendant to access life-saving medical care unavailable at FCC Butner. See *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020) (emphasizing the relevance of proximity to release in compassionate release determinations).

6. **Rehabilitation Efforts**

Defendant has completed vocational training in construction safety and HVAC repair, parenting classes, financial responsibility programs, and faith-based reentry initiatives. These efforts demonstrate his readiness for reintegration and highlight his minimal risk to public safety. See *Pepper v. United States*, 562 U.S. 476, 491 (2011) (noting that post-sentencing conduct is a critical factor in evaluating rehabilitation).

### c. Broader Implications of These Failures

The convergence of these extraordinary factors reflects systemic failures that directly contravene the statutory mandates of § 3553(a) and the principles underpinning compassionate release law. FCC Butner's disproportionately high inmate death rate—accounting for 25% of all BOP deaths nationwide—demonstrates a systemic inability to provide adequate care and safety. This fact highlights the immediate risks faced by Defendant as a medically vulnerable inmate with life-threatening conditions. (*See* U.S. Dep't of Just., Off. of the Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Care and Mortality Rates*, at 12 (2021) (documenting high mortality rates at FCC Butner)).

Under § 3553(a), sentencing must account for:

- **(2)(D) Providing correctional treatment in the most effective manner:** FCC Butner has categorically failed to meet this mandate, as evidenced by its systemic neglect of Defendant's chronic and worsening medical conditions.

- **(1) The history and characteristics of the defendant:** Defendant's consistent minimum security classification, recent "out custody" designation, exemplary disciplinary record, and significant rehabilitation efforts reflect his readiness for reintegration and minimal risk to public safety.

- **(2)(A) The need for the sentence imposed to reflect the seriousness of the offense:** Defendant has served the punitive portion of his sentence, and continued incarceration in a facility incapable of meeting his medical needs serves no additional penal purpose.

Moreover, the Government's opposition relies on personal attacks against Defendant, a first-time pro se litigant with limited access to information and resources, while contradicting the BOP's

own classifications and findings. The following points highlight the ways in which the Government's opposition is discredited by the BOP itself and even by facts the Government brings to light:

- **Minimum Security Classification and "Out Custody" Designation:** The BOP has consistently classified Defendant as minimum security since 2021 and recently upgraded him to "out custody," reflecting an institutional conclusion that Defendant poses no meaningful risk to public safety and is ready for reintegration into the community. These findings directly contradict the Government's assertions of Defendant's dangerousness.

- **Low Recidivism Risk Assessed by PATTERN Score:** Defendant has maintained a consistently low or negative recidivism risk score under the BOP's PATTERN assessment tool. This score underscores Defendant's rehabilitation and minimal likelihood of reoffending, further supporting the BOP's determination that he poses no risk to public safety. The Government's opposition fails to address this objective metric of Defendant's readiness for release.

- **Care Level 3 Reclassification by BOP Central Office Medical:** The BOP Central Office Medical staff reviewed Defendant's medical records as part of a routine transfer approval process and reclassified him to Care Level 3, confirming the severity of his chronic conditions and the systemic medical neglect at FCC Butner. This reclassification validates the claims made in Defendant's initial motion and highlights the life-threatening incompetence of Butner Medical staff.

- **Acknowledgment of Weight Loss in Opposition:** The Government itself introduced Defendant's unexplained 45-pound weight loss into the record, a fact they attempted to

weaponize against him without acknowledging the urgent medical risk it represents. This mirrors the indifference displayed by Butner Medical staff, who have consistently failed to investigate or treat Defendant's serious medical issues.

- **Contradiction of the BOP's Assessment of Defendant's Risk:** While the BOP considers Defendant a low-risk, rehabilitated individual suitable for community integration, the Government resorts to rhetoric that seeks to discredit him through baseless accusations, inflammatory language, and personal attacks.

These inconsistencies undermine the credibility of the Government's opposition and highlight the systemic failures Defendant continues to face within the BOP. As such, judicial intervention is required. Compassionate release is necessary to reconcile these institutional contradictions, address Defendant's life-threatening medical conditions, and uphold the principles of fairness proportionality, and justice under 18 U.S.C. § 3582(c)(1)(A).

Courts have recognized that systemic institutional failures, proximity to release, and an inmate's medical vulnerabilities collectively warrant relief:

- **United States v. Beck**, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019): Recognized systemic healthcare failures as a basis for release.

- **United States v. Rodriguez**, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020): Emphasized proximity to release and health risks as factors supporting relief.

- **United States v. Davis**, 62 F.4th 212, 216 (4th Cir. 2024): Highlighted the necessity of individualized assessments when systemic failures exacerbate vulnerabilities.

By granting compassionate release, this Court would align its decision with § 3553(a), ensure Defendant's access to life-saving medical care, and uphold the principles of fairness and justice against a backdrop of systemic failures and prosecutorial overreach.

### d. The Court's Role in Ensuring Justice

The Court has an essential role in rectifying systemic injustices and ensuring humane treatment. Granting compassionate release would prevent Defendant from becoming another statistic in FCC Butner's alarming mortality rate while upholding the principles of justice, fairness, and proportionality. See *United States v. Davis*, 62 F.4th 212, 216 (4th Cir. 2024) (noting the necessity of judicial intervention when systemic failures exacerbate an inmate's vulnerabilities).

### e. Conclusion

Immediate compassionate release is the only remedy consistent with the statutory mandates of 18 U.S.C. § 3553(a), § 3582(c)(1)(A), and the principles of fairness and humanity. Defendant's extraordinary medical conditions, combined with systemic failures and proximity to release, present a compelling case for judicial intervention to ensure justice and protect his life.

## III. Response to the Government's Opposition

Defendant respectfully submits the following detailed responses to the arguments raised by the Government in its opposition to his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). While the Government seeks to discredit Defendant's claims, their reliance on case law and arguments is either misplaced or contradicted by the facts, the Bureau of Prisons' (BOP) own assessments, and Defendant's circumstances. This section addresses each argument

in turn, with particular attention to the principles of fairness, individualized analysis, and the requirements of § 3553(a).

*1. Health Conditions and Systemic Medical Neglect*

The Government minimizes Defendant's severe medical conditions and systemic neglect, claiming that the BOP has provided adequate care. This assertion directly conflicts with the BOP's reclassification of Defendant to Care Level 3 and the documented failures of FCC Butner's medical staff to provide appropriate treatment.

- **Government's Claim:** Defendant's medical conditions are being adequately managed by BOP staff.
  **Rebuttal:**

- The reclassification to Care Level 3 underscores the insufficiency of prior care and highlights the systemic neglect at FCC Butner. Defendant's unexplained weight loss (nearly 25% of his body weight), enlarging prostate, and Chronic Immune Thrombocytopenic Purpura (ITP) remain untreated, placing him at significant risk of fatal complications.

- The Government's claims disregard statutory obligations under § 3553(a)(2)(D), which mandates that sentences provide necessary medical care and ensure humane treatment.

- Compassionate release is consistent with § 3553(a)(2)(B), as Defendant's continued incarceration under such conditions does not serve any meaningful deterrent effect.
  **Citations:**

- *United States v. Mangarella*, 57 F.4th 197, 200 (4th Cir. 2023) (systemic healthcare failures constitute extraordinary and compelling reasons for compassionate release).

- *United States v. Beck*, 425 F. Supp. 3d 573, 577 (M.D.N.C. 2019) (release granted due to systemic delays in treating chronic medical conditions).

- *United States v. Davis*, 62 F.4th 212, 216 (4th Cir. 2024) (systemic neglect, combined with medical vulnerabilities, rendered continued incarceration disproportionately harsh).

- **Government's Claim:** Defendant's weight loss is not extraordinary or compelling.
  **Rebuttal:**

- Defendant's sudden 45-pound weight loss, representing nearly 25% of his body weight, raises concerns of undiagnosed critical illnesses, including cancer. Despite this, FCC Butner's medical staff has failed to conduct appropriate diagnostics or interventions.

- The Government's attempt to weaponize this alarming symptom against Defendant mirrors the indifference exhibited by FCC Butner's staff, underscoring systemic neglect.

- § 3553(a)(1) requires consideration of Defendant's "history and characteristics," which include his unique vulnerabilities and the BOP's failure to address them.
  **Citations:**

- *United States v. Beck*, 425 F. Supp. 3d at 577.

- *United States v. Colvin*, No. 3:19-cr-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (delays in diagnosing critical conditions constitute extraordinary circumstances).

- **Government's Case Law:**

- **United States v. Kincaid**, 802 F. App'x 187 (6th Cir. 2020): The Government argues that BOP medical care is sufficient.

  **Rebuttal:**

- *Kincaid* involved a defendant who was receiving adequate medical treatment and did not demonstrate systemic failures in care. In contrast, Defendant's reclassification to Care Level 3 and the lack of any corresponding treatment highlight profound inadequacies in FCC Butner's healthcare.

- Courts have repeatedly held that systemic neglect, as evidenced in Defendant's case, justifies relief under § 3582(c)(1)(A).

## 2. *Custody Classification and Placement*

The Government disregards Defendant's minimum-security classification and recent designation as "Out" custody, both of which confirm that he poses no risk to public safety under § 3553(a)(2)(C).

- **Government's Claim:** Defendant's custody placement at FCI Butner Low is appropriate.

  **Rebuttal:**

- Defendant's placement at FCI Butner Low contradicts his custody score of 6 and his "Out" custody designation. Judge Ellis explicitly recommended minimum-security placement, which the BOP has ignored.

- Defendant's placement in a higher-security facility violates BOP Program Statement 5100.08, which mandates that inmates be housed in facilities consistent with their

classification. This misplacement undermines Defendant's reentry preparation, contrary to § 3553(a)(2)(D).

**Citations:**

- *United States v. Bellamy*, No. 3:12-cr-19-FDW, 2021 WL 1381231, at *3 (W.D.N.C. Apr. 12, 2021) (misaligned placements creating undue risks justified compassionate release).

- BOP Program Statement 5100.08 (requiring custody placement aligned with inmate classification).

- **Government's Case Law:**

- **United States v. Chambliss**, 948 F.3d 691 (5th Cir. 2020): The Government argues that the seriousness of the offense justifies Defendant's placement.

**Rebuttal:**

- Unlike *Chambliss*, Defendant's offense is non-violent, and his exemplary conduct throughout incarceration has been acknowledged by the BOP through his reclassification to "Out" custody.

- Defendant's placement in a higher-security facility contradicts the principles of individualized sentencing and proportionality under § 3553(a).

### 3. *Proximity to Release*

The Government dismisses Defendant's eligibility for home confinement within 12 months as irrelevant.

- **Government's Claim:** Proximity to release does not justify compassionate release.

  **Rebuttal:**

- Proximity to release is a significant factor under § 3553(a)(2)(A), as continued incarceration no longer serves the punitive goals of sentencing.

- Defendant's request for a 12-month adjustment aligns with fairness and proportionality under § 3553(a).

  **Citations:**

- *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020) (proximity to release is a significant factor).

- *United States v. Ebbers*, 432 F. Supp. 3d 421, 430 (S.D.N.Y. 2020) (diminished benefit of continued incarceration as release approaches).

- **Government's Case Law:**

- **United States v. Sapp,** 2020 WL 515935, at *3 (E.D. Cal. Jan. 31, 2020): The Government argues that Defendant's proximity to release is not a compelling reason for compassionate release.

  **Rebuttal:**

- *Sapp* involved a defendant whose medical conditions were being adequately managed, unlike Defendant's case. Furthermore, proximity to release has been recognized by courts as a critical factor when systemic neglect is present.

*4. Rehabilitation*

The Government minimizes Defendant's rehabilitation efforts, failing to acknowledge their significance under § 3553(a)(1) and (a)(2)(C).

- **Government's Claim:** Rehabilitation alone does not justify compassionate release.
  **Rebuttal:**

- Defendant's vocational training, faith-based programs, and financial responsibility courses demonstrate his commitment to reintegration and low recidivism risk. Courts have consistently recognized post-sentencing rehabilitation as a critical factor in compassionate release decisions.

- Defendant's negative recidivism score, as calculated under the BOP's PATTERN system, further confirms his readiness for reintegration.
  **Citations:**

- *United States v. Rodriguez*, 451 F. Supp. 3d at 407.

- *United States v. Ebbers*, 432 F. Supp. 3d at 430.

- **Government's Case Law:**

- **United States v. Ruffin**, 978 F.3d 1000 (6th Cir. 2020): The Government argues that rehabilitation alone is insufficient for release.
  **Rebuttal:**

- While *Ruffin* correctly notes that rehabilitation alone does not suffice, Defendant's case involves extraordinary and compelling circumstances beyond rehabilitation, including systemic neglect and medical vulnerabilities.

*5. Staff Misconduct and Systemic Failures*

The Government ignores documented misconduct by Officer D. Ford and the broader systemic culture of hostility at FCC Butner, which places Defendant at ongoing risk of harm.

- **Government's Claim:** Defendant's safety is not at risk.
  **Rebuttal:**

- Officer Ford's fabrication of disciplinary charges against Defendant, coupled with his attempts to incite inmate violence, highlights systemic failures within the BOP. Despite these documented actions, Ford continues to work at FCC Butner, perpetuating a hostile environment.

- The systemic failures that allowed Ford's misconduct to go unaddressed directly contradict § 3553(a)(2)(D), which mandates that sentences ensure humane treatment.
  **Citations:**

- *Spencer v. Krause*, No. 17-2264, 2017 WL 2264855, at *2 (9th Cir. June 6, 2017) (fabricated evidence undermines due process).

- *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (prison officials must protect inmates from known risks of harm).

- *United States v. Handy*, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021) (systemic staff misconduct as a basis for compassionate release).

**Government Case Law Analysis**

The Government cites cases to assert that systemic conditions or staff misconduct do not independently justify compassionate release. They also dismiss allegations of systemic staff

misconduct, relying on cases that fail to address the pervasive issues documented at FCC

Butner.However, these cases are either factually distinguishable or misapplied in this context:

- **Government's Citation: United States v. Alam**, 960 F.3d 831, 836 (6th Cir. 2020): The Government cites *Alam* to argue that the court should not intervene in BOP administrative matters, that courts should defer to the BOP's discretion. **Rebuttal:**

- *Alam* Alam involved exhaustion of administrative remedies and did not address systemic failures or staff misconduct. Here, Defendant has exhausted administrative remedies and provides evidence of Officer Ford's fabrication of charges and attempts to incite inmate violence.

- Courts have recognized that staff misconduct and systemic failures justify compassionate release. **Citations:**

- *United States v. Handy*, 2021 WL 2480100, at *2.

- **Government's Citation: United States v. Raia**, 954 F.3d 594, 597 (3d Cir. 2020): The Government cites *Raia* to assert that systemic conditions do not independently justify compassionate release. **Rebuttal:**

- *Raia* involved generalized concerns about COVID-19 and did not address the specific and documented misconduct present here.

- Courts have granted relief in cases of systemic failures that directly jeopardize inmate safety.

  **Citations:**

- *Farmer v. Brennan*, 511 U.S. at 834 (establishing a duty to protect inmates from known risks).

**Relevance to Defendant's Case:**

Documented staff misconduct, including fabricated charges and incitement to violence, constitutes extraordinary circumstances that violate Defendant's rights and contravene the statutory mandates of § 3553(a)(2)(D). These failures reflect a broader pattern of systemic neglect and hostility within FCC Butner, necessitating immediate judicial intervention to ensure Defendant's safety.

The continued employment of Officer Ford, despite documented misconduct, is incompatible with the principles of humane treatment mandated under § 3553(a)(2)(D). Compassionate release rectifies these systemic failures and protects the safety and dignity of incarcerated individuals.

### 6. *Government's Character Allegations and Misrepresentations*

The Government raises unsupported allegations about Defendant's character and conduct to undermine his motion for compassionate release. These claims are speculative, contradicted by BOP records, and fail to address the extraordinary and compelling circumstances justifying relief.

- **Government's Claim:** Defendant has misrepresented his medical conditions or circumstances.

  **Rebuttal:**

- Defendant's Care Level 3 reclassification by the BOP Central Office independently validates the severity of his medical conditions. This official determination contradicts any assertion of misrepresentation.

- The BOP's refusal to provide Defendant access to his medical records is well-documented, hindering his ability to present comprehensive evidence. The Government's reliance on these inaccessible records to challenge Defendant's claims is unjust.

- **Government's Claim:** Defendant's character does not support release.
  **Rebuttal:**

- The BOP's designation of Defendant as "Out" custody and a minimum-security classification reflects an institutional determination that he poses no public safety risk.

- Defendant's vocational training, faith-based programs, and parenting courses exemplify his commitment to rehabilitation and reintegration. Courts have repeatedly recognized such efforts as critical to compassionate release decisions.
  **Citations:**

- *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020) (post-sentencing rehabilitation supports release).

- *United States v. Ruffin*, 978 F.3d 1000 (6th Cir. 2020) (emphasizing rehabilitation as a factor for relief).

- **Government's Misrepresentation of Evidence:**

- The Government mischaracterizes Defendant's documented weight loss as unextraordinary, despite its acknowledgment in medical records. This misrepresentation

reflects a pattern of indifference to the systemic failures that have endangered Defendant's life.

- Allegations of mischaracterization are contradicted by Judge Ellis's sentencing recommendation for minimum-security placement and the BOP's PATTERN score determination of low recidivism risk.

By raising unsupported allegations, the Government distracts from the extraordinary circumstances of Defendant's case, which are independently validated by institutional records and systemic evaluations.

### 7. *Fight and Violence Allegations*

The Government raises allegations regarding a fight in which Defendant was involved, attempting to characterize this incident as a reflection of violent tendencies incompatible with compassionate release. These allegations are not only misrepresented but fail to consider the documented facts of the incident, the Defendant's medical vulnerabilities, and the systemic failures that led to the altercation.

- **Government's Claim:** Defendant's involvement in a fight demonstrates violent behavior and disqualifies him from compassionate release.
  **Rebuttal:**

- The incident in question occurred when Defendant was violently attacked without provocation by another inmate under the influence of illegal drugs. The BOP failed to

prevent these drugs from entering FCC Butner and to ensure a safe environment for inmates.

- Defendant acted purely in self-defense to protect himself from severe injury or death, a response necessitated by his medical vulnerabilities, including Chronic Immune Thrombocytopenic Purpura (ITP), a single kidney, and hypertension.

- The Government's characterization of this incident as a reflection of violent behavior ignores Defendant's medical conditions, which make him uniquely vulnerable to life-threatening harm from even minor physical trauma.

**Citations:**

- *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (holding that prison officials have a duty to protect inmates from known risks of harm).

- *United States v. Beck*, 425 F. Supp. 3d 573, 577 (M.D.N.C. 2019) (recognizing that systemic failures to ensure safety justify relief under § 3582(c)(1)(A)).

- **Government's Claim:** Defendant's actions during the fight contradict claims of rehabilitation.

**Rebuttal:**

- Defendant's response to the attack was measured, prioritizing survival over retaliation. He did not escalate the situation or cause excessive harm to his attacker, despite the life-threatening risks he faced.

- The BOP's subsequent issuance of a 201 SHOT for "fighting" does not reflect the context of the incident or Defendant's lack of intent to engage in violence. Defendant has no

history of violent behavior and has consistently maintained a minimum-security classification and "Out" custody designation.

**Citations:**

- *United States v. Handy*, No. 3:10-cr-00124, 2021 WL 2480100, at *2 (D. Alaska June 17, 2021) (noting that non-violent conduct and rehabilitation weigh heavily in favor of compassionate release).

- **Government's Claim:** Defendant's presence at FCC Butner Low reflects an appropriate security placement given his behavior.

  **Rebuttal:**

- The BOP's classification of Defendant as minimum custody and his recent "Out" custody designation confirm his low-risk status. His placement at FCC Butner Low, a higher-security facility, is the result of misaligned custody and security assignments, not any inherent risk he poses.

- Judge Ellis's recommendation for minimum-security placement has been ignored, and the BOP's failure to transfer Defendant to a safer facility has subjected him to unnecessary dangers, including the unprovoked attack in question.

  **Citations:**

- *United States v. Bellamy*, No. 3:12-cr-19-FDW, 2021 WL 1381231, at *3 (W.D.N.C. Apr. 12, 2021) (finding that misaligned custody placements justified compassionate release).

- **Government's Misrepresentation of the Incident:**

- The Government's reliance on the fight to oppose compassionate release ignores critical context: the failure of FCC Butner to prevent drug use, the absence of adequate safeguards for medically vulnerable inmates, and the systemic neglect that left Defendant defenseless against an unprovoked attack.

- The incident underscores the systemic failures at FCC Butner, which has the highest inmate mortality rate in the BOP system and a well-documented history of violence, neglect, and drug-related incidents.

  **Citations:**

- U.S. Dep't of Just., Off. of the Inspector Gen., *Review of the Federal Bureau of Prisons' Monitoring of Inmate Isolation Policies* (2021), https://oig.justice.gov.

- Associated Press, *Inmate Death at FCC Butner Raises Concerns*, AP News, Feb. 22, 2024, https://apnews.com.

By focusing on this single incident, the Government distracts from the extraordinary and compelling circumstances of Defendant's case, including his chronic medical conditions, systemic failures at FCC Butner, and documented rehabilitation efforts. The fight in question was an isolated, defensive response to a violent attack, not a reflection of Defendant's character or conduct.

Defendant's actions during the incident were consistent with the principles of self-defense and survival, particularly given his unique medical vulnerabilities. Courts have recognized that systemic failures contributing to violence and unsafe conditions can justify compassionate release, particularly for inmates with heightened medical risks. See *Farmer v. Brennan*, 511 U.S. at 834.

Defendant respectfully requests that the Court recognize the context of this incident and focus on the broader systemic failures and extraordinary circumstances justifying his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

### 8. COVID-19 and the Government's Assertions

The Government's opposition highlights the BOP's reported COVID-19 infection rates and vaccination efforts as evidence of sufficient mitigation measures. However, this portrayal ignores systemic flaws in the BOP's pandemic response, underreporting of infection rates, and the unique risks posed by Defendant's medical conditions. Additionally, the Government entirely fails to address the critical point that Defendant was misclassified as Care Level 2 throughout the COVID-19 pandemic, resulting in a complete lack of treatment or monitoring for his severe medical conditions.

### 1. Systemic Deterrence from COVID-19 Testing

During the pandemic, the BOP implemented policies that effectively discouraged inmates from seeking COVID-19 testing, artificially lowering reported infection rates:

- **Opaque Testing Procedures:** Inmates at FCC Butner Low faced unclear and inconsistent protocols for obtaining COVID-19 tests. Testing requests made during medical interactions such as sick call or the pill line were frequently denied.

- **Punitive Quarantine Measures:** Inmates who obtained tests were placed in the Special Housing Unit (SHU), which is typically reserved for disciplinary actions. SHU conditions deterred testing due to:

- Severe restrictions on out-of-cell time (at most 45 minutes every other day).

- Insufficient hygiene resources and substandard meals, which were often cold or nutritionally inadequate.

- Overcrowding, as the SHU served all five Butner facilities, including medium- and high-security inmates, creating unsafe conditions.

- **Resulting Deterrence:** These conditions discouraged inmates from seeking tests, undermining accurate reporting of infection rates.

The BOP's COVID-19 Pandemic Response Plan does not address the punitive effects of these quarantine measures, further highlighting systemic flaws. (BOP COVID-19 Pandemic Plan)

---

## 2. Underreporting of COVID-19 Cases

Evidence indicates that the BOP underreported COVID-19 infections:

- **Limited Testing Capacity:** A Government Accountability Office (GAO) report identified inadequate testing capacity as a major factor leading to underreported infection rates across BOP facilities. (GAO Report)

- **Inconsistent Reporting Practices:** The Department of Justice's Office of the Inspector General (OIG) documented discrepancies in the BOP's data collection and reporting of

COVID-19 cases, casting doubt on the reliability of infection statistics. (DOJ OIG Report)

These findings confirm that reported infection rates at FCC Butner Low do not accurately reflect the prevalence of COVID-19 within the facility.

### 3. Unique Medical Vulnerabilities

The Government's reliance on vaccination status to argue for sufficient protection ignores the unique severity of Defendant's health conditions and the systemic failures in his medical care:

- **Misclassification as Care Level 2:** Defendant was classified as Care Level 2 throughout the COVID-19 pandemic, despite his chronic and life-threatening conditions. This misclassification meant Defendant's Chronic Immune Thrombocytopenic Purpura (ITP), hypertension, single kidney, and lack of a spleen were neither treated nor monitored. Butner medical staff failed to account for these conditions or address their interaction with COVID-19 risks, regardless of whether they met official comorbidity criteria.

- **Chronic Immune Thrombocytopenic Purpura (ITP):** Defendant's Chronic ITP can be triggered by viral infections like COVID-19, causing dangerously low platelet counts and increasing the risk of fatal bleeding events, regardless of vaccination status.

- **Compromised Immune System:** Defendant's lack of a spleen and single kidney further compromise his ability to recover from infections, significantly increasing the risks of severe complications from COVID-19.

These conditions amplify the life-threatening risks posed by COVID-19 exposure in the crowded and poorly ventilated housing units at FCC Butner Low. The Government's argument misses the critical point: Defendant's conditions went untreated and unmonitored because medical staff were unaware of their severity, reflecting systemic neglect rather than individual fitness.

## 4. Institutional Negligence in Risk Mitigation

The BOP failed to implement adequate measures to protect inmates from COVID-19:

- **Overcrowded Housing Units:** Units at FCC Butner Low housed approximately 120 inmates in close proximity, creating high transmission risks.

- **Staff Noncompliance with Protocols:** COVID-19 outbreaks in BOP facilities have frequently been traced to staff introducing the virus due to noncompliance with safety protocols, disproportionately affecting high-risk inmates like Defendant.

- **Failure to Account for Misclassified Inmates:** Defendant's misclassification as Care Level 2 meant that Butner medical staff failed to provide the heightened monitoring or protective measures required for his health conditions.

These systemic failures compounded the risks posed to Defendant and other medically vulnerable individuals.

## 5. Legal Precedents Supporting Compassionate Release

Courts have consistently granted compassionate release to inmates with severe health conditions during the COVID-19 pandemic:

- **United States v. Colvin**, No. 3:19-cr-179, 2020 WL 1613943 (D. Conn. Apr. 2, 2020): Granted release to a diabetic inmate, citing the inability of the BOP to adequately protect high-risk individuals from COVID-19.

- **United States v. Jones**, 980 F.3d 1098, 1102 (6th Cir. 2020): Recognized that preexisting health conditions combined with COVID-19 risks constitute extraordinary and compelling reasons for release.

- **United States v. Beck**, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019): Granted release to an inmate with chronic health issues, finding the BOP's response to be inadequate.

These precedents affirm that systemic failures in addressing health risks, combined with Defendant's unique vulnerabilities, justify compassionate release.


## 6. Conclusion

The Government's reliance on reported COVID-19 infection rates and vaccination status fails to address the systemic flaws in the BOP's pandemic response and Defendant's unique medical risks. Defendant's misclassification as Care Level 2 during his entire incarceration at FCC Butner meant his severe medical conditions were neither treated nor monitored, compounding the dangers posed by COVID-19. The issue is not whether Defendant's conditions met formal comorbidity criteria but rather that Butner medical staff were unaware of or indifferent to their severity.

Systemic deterrence of testing, underreporting of cases, and the BOP's negligence in mitigating COVID-19 risks demonstrate that FCC Butner Low cannot safeguard Defendant's health. Courts

have repeatedly found that such circumstances warrant compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Granting Defendant's motion would ensure access to necessary medical care and mitigate the life-threatening risks of continued incarceration in a facility ill-equipped to address his vulnerabilities.

### 9. Rebutting the Government's Arguments on § 3553(a) Sentencing Factors

The Government's opposition misrepresents the § 3553(a) sentencing factors by failing to account for Defendant's extraordinary and compelling circumstances, his exemplary conduct while incarcerated, and the systemic failures at FCC Butner. A proper application of the § 3553(a) factors supports compassionate release or home confinement, as the purposes of sentencing are no longer served by Defendant's continued incarceration.

### 1. Mischaracterization of the Nature and Circumstances of the Offense

The Government emphasizes the seriousness of Defendant's white-collar offense while ignoring the critical context of his rehabilitation and medical vulnerabilities:

- **Rehabilitation and Accountability:** Defendant has served a substantial portion of his sentence and has engaged in vocational training, parenting programs, and faith-based initiatives, reflecting his commitment to accountability and reintegration.

- **Nonviolent Nature of the Offense:** Defendant's conviction for a nonviolent financial crime does not justify exposing him to life-threatening risks in a facility unable to address

his severe medical needs. Courts have consistently recognized that continued incarceration under such circumstances undermines proportionality and fairness. *See United States v. Beck*, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019).

The Government's reliance on the nature of the offense as a basis for denial is misplaced, as Defendant's conduct since incarceration demonstrates that he has met the rehabilitative goals of sentencing.

## 2. Failure to Address Defendant's History and Characteristics

The Government's opposition minimizes the impact of Defendant's medical conditions and ignores the BOP's reclassification of Defendant to Care Level 3:

- **Medical Conditions and Misclassification:** Defendant's Chronic Immune Thrombocytopenic Purpura (ITP), single kidney, lack of a spleen, chronic hypertension, and unexplained weight loss make him uniquely vulnerable to severe complications. The BOP's initial misclassification as Care Level 2 throughout the COVID-19 pandemic further exacerbated these risks, as Defendant was left untreated and unmonitored during a critical period.

- **Positive Institutional Conduct:** Defendant's PATTERN score reflects a negative recidivism risk, and his minimum-security classification and recent "Out" custody designation confirm his low public safety risk.

- **Proximity to Release:** Defendant's projected home confinement date is December 2025. Granting a modest 12-month adjustment aligns with the principles of fairness and proportionality while addressing his urgent medical needs.

The Government's characterization of Defendant ignores these critical facts, focusing narrowly on the offense while disregarding his significant progress and extraordinary vulnerabilities.

### 3. Misapplication of the Purposes of Sentencing

The Government's arguments fail to reconcile Defendant's circumstances with the purposes of sentencing under § 3553(a)(2):

- **Seriousness of the Offense (§ 3553(a)(2)(A)):** Defendant has already served the punitive portion of his sentence, and his exemplary conduct demonstrates respect for the law. Continued incarceration under life-threatening conditions undermines respect for the law by subjecting him to disproportionate and inhumane punishment. See *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020).

- **Deterrence (§ 3553(a)(2)(B)):** Defendant's rehabilitation and recidivism score demonstrate that he no longer requires incarceration to deter future misconduct. Courts have recognized that rehabilitated individuals nearing release do not require further deterrence through continued imprisonment.

- **Public Safety (§ 3553(a)(2)(C)):** The BOP's classification of Defendant as "Out" custody and his consistent minimum-security status confirm that he poses no public

safety risk. The Government's speculative assertions are contradicted by these institutional findings.

- **Medical Care (§ 3553(a)(2)(D)):** Defendant's chronic and worsening medical conditions require specialized care unavailable at FCC Butner. Compassionate release would fulfill the statutory mandate to provide necessary medical care in the most effective manner.

The Government's opposition fails to address how continued incarceration under these circumstances serves any legitimate sentencing purpose.

### 4. Ignoring Sentencing Disparities and Systemic Failures

The Government overlooks the systemic failures at FCC Butner and the disparities created by denying relief in cases involving similar circumstances:

- **Sentencing Disparities (§ 3553(a)(6)):** Courts have granted compassionate release in cases involving systemic medical neglect, severe health conditions, and proximity to release. See *United States v. Beck*, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020). Denying relief here would create unwarranted disparities by subjecting Defendant to disproportionate punishment compared to similarly situated individuals.

- **Systemic Neglect and Misalignment:** Defendant's misclassification as Care Level 2 throughout his incarceration and the failure of Butner Medical to treat or monitor his conditions reflect broader systemic issues that have placed him in an untenable and dangerous position. These systemic failures amplify the need for judicial intervention.

The Government's opposition fails to acknowledge these disparities and the role of systemic neglect in undermining sentencing fairness.

## 5. Mischaracterization of Rehabilitation and Accountability

The Government's dismissal of Defendant's rehabilitation efforts ignores the significant progress he has made:

- **Vocational and Faith-Based Programs:** Defendant has completed multiple certifications and courses aimed at improving his employability, parenting skills, and reentry readiness.

- **Commitment to Restitution:** Defendant remains committed to fulfilling his restitution obligations, and compassionate release would enhance his ability to contribute meaningfully through employment.

- **Consistent Institutional Record:** Defendant has maintained exemplary conduct throughout his incarceration, further reflecting his accountability and readiness for reintegration.

The Government's failure to recognize these efforts contradicts the principle of individualized sentencing under § 3553(a).

## 6. Conclusion

The Government's opposition misapplies the § 3553(a) factors by ignoring Defendant's extraordinary circumstances, systemic failures at FCC Butner, and demonstrated rehabilitation.

Proper application of these factors strongly supports compassionate release or home confinement:

- Defendant's nonviolent offense, coupled with his exemplary conduct and rehabilitation efforts, align with the purposes of sentencing.

- Continued incarceration under life-threatening conditions fails to serve the interests of justice, proportionality, or public safety.

- Compassionate release would uphold the statutory mandate to provide necessary medical care and address systemic failures that have jeopardized Defendant's life.

The Court should grant Defendant's motion for compassionate release, advancing his release by 12 months to ensure access to life-saving medical care and opportunities for reintegration in accordance with § 3553(a).

## 10. Release Preparedness

The Government's opposition fails to account for Defendant's detailed release plan and proactive reentry efforts, which demonstrate his readiness to reintegrate into society successfully. Defendant's plan addresses every critical aspect of his transition, including housing, medical care, employment, and family support, while his extensive rehabilitation efforts further underscore his preparedness for release.

### a. Release Plan

Defendant has developed a comprehensive and realistic release plan through his faith-based reentry coursework. This plan ensures stability, accountability, and a clear path toward reintegration:

1. **Housing:**

- **Primary Plan:** Defendant plans to rent a room or studio apartment in Alexandria, Virginia, close to his children. This location will allow him to rebuild his relationship with his children and provide them with emotional and financial support.

- **Contingency Plan:** If temporary housing challenges arise, Defendant's father in Palmyra, Virginia, has offered him a spare room in his home.

- **Stability:** This dual-layered housing plan guarantees immediate and long-term stability, minimizing stress during the transition.

2. **Medical Care:**

- **Health Insurance Enrollment:** Defendant will enroll in a health insurance plan through Healthcare.gov immediately upon release, with assistance from his family to cover initial costs.

- **Specialist Care:** Defendant will prioritize treatment for Chronic Immune Thrombocytopenic Purpura (ITP), kidney health, prostate issues, and his unexplained weight loss.

- **Employer-Sponsored Coverage:** Once employed, Defendant will transition to employer-sponsored health benefits, ensuring continuity of care.

3. **Employment:**

- **Employment Goals:** Defendant intends to secure a full-time role as a software engineer or developer, leveraging over 20 years of experience in building cloud systems, web applications, and mobile apps.

- **Freelance Work:** As an interim income source, Defendant will pursue freelance software development projects while seeking full-time employment.

- **Marketability:** The Northern Virginia and Washington, D.C., metropolitan area boasts one of the nation's strongest technology job markets, aligning with Defendant's skills and experience.

4.  **Family Support:**

- **Local Support Network:** Defendant's children, father, and close friends reside in the Alexandria area, providing emotional stability and practical assistance.

- **Extended Family Support:** Defendant's mother and brother, based in Connecticut and New Jersey, have pledged additional support, including financial help and frequent visits.

- **Logistical Assistance:** Family members will help with transportation, medical appointments, and employment arrangements.

5.  **Restitution and Financial Responsibility:**

- Defendant is committed to fulfilling restitution obligations through consistent payments from employment or freelance work.

- Financial literacy courses completed during incarceration have prepared him to manage his obligations responsibly.

This plan addresses all critical aspects necessary for a smooth transition, reflecting Defendant's commitment to becoming a productive, law-abiding member of society.

**b. Evidence of Rehabilitation**

Defendant's extensive rehabilitation efforts further demonstrate his readiness for release:

- **Certifications and Programs:**

- Construction Core Safety and Skills

- HVAC Repair

- Parenting and Financial Responsibility Courses

- Faith-Based Reentry Program Completion

- **Participation in First Step Act Programming:** Despite systemic barriers, Defendant has completed all available courses, earning time credits and demonstrating his dedication to personal growth.

- **Exemplary Conduct:** Defendant has maintained a zero-recidivism risk score and minimum-security classification, highlighting his commitment to rehabilitation and compliance with institutional rules.

**c. Proactive Reentry Preparation**

Defendant has taken significant steps to prepare for life post-incarceration, ensuring a smooth transition:

1. **Employment Readiness:** Vocational certifications and decades of professional experience position Defendant to secure stable employment promptly.

2. **Parental Responsibilities:** Completion of parenting programs reflects Defendant's dedication to his children and their well-being.

3. **Faith-Based Reentry:** Participation in faith-based programs has fostered personal growth and moral development, equipping Defendant with tools to navigate post-release challenges.

4. **Restitution Commitment:** Financial courses and employment plans ensure Defendant's ability to meet restitution obligations.

**d. Overcoming Systemic Barriers**

Defendant's achievements are particularly notable given the systemic challenges at FCC Butner Low:

- **Understaffing and Program Delays:** Chronic understaffing and multi-year waitlists limited access to programming, yet Defendant has completed all available certifications.

- **Hostile Environment:** Misaligned custody placement in a higher-security facility exposed Defendant to unnecessary risks, yet he maintained exemplary behavior.

- **Medical Challenges:** Despite untreated chronic health conditions, Defendant persevered in his rehabilitation efforts.

**e. Legal Precedents Supporting Release Plans**

Courts have consistently recognized that detailed release plans and significant rehabilitation efforts weigh heavily in favor of compassionate release:

- *United States v. McGraw*, No. 2:02-cr-00018, 2019 WL 2059488, at *4 (S.D. Ind. May 9, 2019): Highlighted the role of comprehensive release plans in ensuring successful reintegration.

- *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020): Emphasized the importance of rehabilitation and readiness for release in granting compassionate release.

- *United States v. Walker*, No. 20-cr-57, 2021 WL 1115863, at *3 (S.D.N.Y. Mar. 24, 2021): Granted release based on the defendant's role in supporting family and proactive reentry efforts.

**f. Conclusion**

Defendant's release plan and rehabilitation efforts demonstrate his readiness to reintegrate into society as a productive and responsible individual. The plan is comprehensive, realistic, and supported by a strong network of family and professional skills. Granting compassionate release would ensure Defendant's transition is successful, addressing his medical needs while upholding the principles of justice and proportionality.

**IV. Conclusion**

The Government's opposition fails to refute the extraordinary and compelling circumstances that justify Defendant's immediate release or transfer to home detention. The convergence of untreated medical conditions, systemic neglect, misaligned placement, staff misconduct, and exceptional rehabilitation efforts presents a profoundly compelling case under 18 U.S.C. § 3582(c)(1)(A). Each of these factors independently meets the statutory threshold for compassionate release, and together, they underscore the urgent need for judicial intervention.

Defendant respectfully requests that this Court grant his motion for compassionate release, advancing his release by 12 months to ensure access to life-saving medical care and protection from the systemic failures that jeopardize his life daily. Such an adjustment aligns with the purposes of sentencing under § 3553(a), including providing necessary medical care, promoting fairness, and ensuring proportionality.

In the alternative, should the Court find that additional briefing or information is necessary to resolve this matter, Defendant respectfully requests the appointment of counsel. The complexity of the issues raised—spanning systemic failures, statutory interpretation, and the intersection of health and sentencing considerations—requires professional representation to ensure the fair and equitable resolution of this case. As a pro se litigant with limited access to resources, Defendant would greatly benefit from the assistance of counsel to fully present his case and address the intricacies of compassionate release law and the Court's questions.

Defendant's circumstances demand immediate action. Whether through compassionate release or the appointment of counsel to further develop the record, this Court has the unique opportunity to uphold the principles of fairness, proportionality, and humanity central to § 3553(a).

Respectfully submitted,

**Daniel Keith Boice**

**December 11, 2024**